FILED by _____ D.C.

Page 2

MAY 29 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District SOUTHERN DISTRICT OF FLORIDA |
|---|---|

| Name (under which you were convicted): SCARLET DUARTE | Docket or Case No.: 1:08-2051-cr-LENARD |
|---|---|

| Place of Confinement: FCC COLEMAN CAMP | Prisoner No.: 81409-004 |
|---|---|

| UNITED STATES OF AMERICA | Movant (include name under which you were convicted) |
|---|---|
| v.   SCARLET DUARTE | |

## MOTION

## 12-CV-22012-LENARD/WHITE

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   Southern District Of Florida

   Miami Division

   (b) Criminal docket or case number (if you know): 1:08-cr-20851-JAL-7

2. (a) Date of the judgment of conviction (if you know): 02/24/10

   (b) Date of sentencing: 02/19/10

3. Length of sentence: 97 Months

4. Nature of crime (all counts):

   Money Laundering – 18USC1956

5. (a) What was your plea? (Check one)

   (1)  Not guilty  ☒        (2)  Guilty  ☐        (3)  Nolo contendere (no contest)  ☐

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

   N/A

6. If you went to trial, what kind of trial did you have? (Check one)    Jury ☒    Judge only ☐

cat / div  2255 / 510 / Miami
Case #  08 CR 20851
Judge  Lenard    Mag  PAW
Motn Ifp _____  Fee pd $ _____
Receipt # _____

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?   Yes ☒   No ☐

8. Did you appeal from the judgment of conviction?   Yes ☒   No ☐

9. If you did appeal, answer the following:

   (a) Name of court: US Court Of Appeals For The 11th Circuit

   (b) Docket or case number (if you know): 10-11126-B

   (c) Result: Affirm Conviction

   (d) Date of result (if you know): 01/07/2011

   (e) Citation to the case (if you know):

   (f) Grounds raised:

      1. The evidence was insufficient to convict the defendant

      2. Sentence was both procedurally and substantively unreasonable

   (g) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☐   No ☒

   If "Yes," answer the following:

   (1) Docket or case number (if you know):

   (2) Result:

   (3) Date of result (if you know):

   (4) Citation to the case (if you know):

   (5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

   Yes ☐   No ☒

11. If your answer to Question 10 was "Yes," give the following information:

   (a) (1) Name of court:

      (2) Docket or case number (if you know):

      (3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?    Yes ❑    No ❑

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?    Yes ❑    No ❑

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:    Yes ❑    No ❑

(2) Second petition:    Yes ❑    No ❑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the <u>facts</u> supporting each ground.

GROUND ONE:

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

   **See Attachment**

(b) **Direct Appeal of Ground One:**
   (1) If you appealed from the judgment of conviction, did you raise this issue?
         Yes ☒   No ☐
   (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**
   (1) Did you raise this issue in any post-conviction motion, petition, or application?
         Yes ☐  No ☒
   (2) If your answer to Question (c)(1) is "Yes," state:
   Type of motion or petition:
   Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:




**GROUND TWO:**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See attachment

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ❑

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ❑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See attachment

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❏    No ❏

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❏    No ❏

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:




GROUND FOUR:

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See attachment

(b)  **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❏  No ❏

(2) If you did not raise this issue in your direct appeal, explain why:


(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❏  No ❏

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

Yes ❏   No ❏

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❏   No ❏

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❏   No ❏

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

     All elaborated in the attachment

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?     Yes ☐   No ☒
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Allan B. Kaiser
                              111 NE 1st Street Suite 902
                              Miami, FL 33132

(b) At arraignment and plea: William M. Norris
                              8870 SW 62nd Terrace
                              Miami, FL 33173

(c) At trial:

                              Same as above

(d) At sentencing: Nelson Armando Rodriguez-Varela
                              2 Alhambra Plaza Suite 112
                              Coral Gables, FL 33134

(e) On appeal:            Ivy R. Ginsberg
                             3610 Yatch Club Drive Suite 602
                             Aventura, FL 33180

(f) In any post-conviction proceeding:  Maria Elena Perez       Terminated prior to filing
                             145 Madeira Ave. #310   Had been contracted to
                             Coral Gables, FL 33134  file this motion but was

(g) On appeal from any ruling against you in a post-conviction proceeding: terminated
               N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?    Yes ☒ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?       Yes ☐ No ☒

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:

(b)  Give the date the other sentence was imposed:

(c)  Give the length of the other sentence:

(d)  Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?    Yes ☐  No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you
must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not
bar your motion.*

N/A

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C.
§ 2255, paragraph 6, provides in part that:
   A one-year period of limitation shall apply to a motion under this section.  The limitation period
shall run from the latest of —
      (1) the date on which the judgment of conviction became final;
      (2) the date on which the impediment to making a motion created by governmental action in
      violation of the Constitution or laws of the United States is removed, if the movant was
      prevented from making such a motion by such governmental action;
      (3) the date on which the right asserted was initially recognized by the Supreme Court, if
      that right has been newly recognized by the Supreme Court and made retroactively
      applicable to cases on collateral review; or
      (4) the date on which the facts supporting the claim or claims presented could have been
      discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief:

or any other relief to which movant may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on ___5/23/12___ (date).

_____

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

GROUND ONE

## INEFFECTIVE ASSISTANCE OF COUNSEL

In early February 2009, Mr. Norris, the attorney representing me and the prosecutor, Mr. Osborne were debating over a proffer agreement proposed by the government. Please see copies of the emails (Exhibit "A"). The important aspects of theseemails are: 1) I was ready and willing to plead guilty to the crime I thought that I had committed, and attempt to divert income and avoid taxes, 2) I did not and still contest to this day, that I did not know that Ms. Sotto was committing healthcare fraud, so consequently I did not want to plead guilty to this, and 3) that I had no dealings with Project New Hope. Even  Mr. Osborne indicates in his 2/2/09 reply that he would investigate the possibility of another proffer and get back with Mr. Norris. For whatever reason, an acceptable proffer was never agreed upon.

Mr. Norris at that point recommended that I go to trial. At that point I had been offered a 33 month sentence. In conversations with me, he assured me that the most I could get would be 60 months if the prosecution could prove this case which was doubtful per Mr. Norris. I asked Mr. Norris directly, if I were your daughter would you still recommend that I go to trial?" He replied of course, affirmatively.

Mr. Norris did not prepare well for trial. In addition to this, there are numerous other  factors that were deficient in his representation including: 1) His lack of objecting to the entering of prosecutions Exhibit 91 (See Exhibit "B" and Exhibit "C" - Transcripts), the email about the $40,000.00 invoice that had  not been given to the defense prior to its introduction at trial which is a clear violation of Brady and Giglio 2) In July 2006, I had met with the F.B.I. and was debriefed (See Exhibit "D") and  helped the government with their prosecution of Ms. Sotto. The information contained was under the protection of a "use immunity" letter which Mr. Norris did not address when some of the same information was produced at trial.(3) and on preparing me to take the stand, Mr. Norris told me that there was little he could do to prepare me other than to get up there and "be myself". (4) During sentencing, ineffective counsel for Mr. Norris was brought up on transcript (See Exhibit "C" Page 33, line 18,through Page 50, lines 18-25).

(Brady v. Maryland, 373 U.S. 83,83S. ct. 1194, 10L, Ed 215 (1963)
(Giglio v. United States, 405. U.S. 150, 54-55, 925. CT. 763, 31L. Ed.22d 104 (1972)

The notion that Mr. Norris was ineffective in his representation of myself is not new.

The shortcomings, including the ones elaborated above in Mr. Norris's representation of me are numerous. Certainly, I could ask for a vacation my conviction and a new trial, but, I would however still be  willing to admit to the part, though minimal than that represented not only by my sentence but at trial, that I did play in furthering the criminal activities of Ms. Sotto and other codefendants . I beg this  court in light of the 2 most recent Supreme Court decisions Lafler v. Cooper and Missouri v. Frye that this court vacate my sentence and resentence me to the 33 months that I would have pled to had Mr. Osborne and Mr. Norris been able to forge an agreeable proffer. (See Exhibit "E")

(Lafler v. Cooper, BL 67236 (U.S. 3/21/12)
(Missouri v. Frye, 2012 BL 67235 (U.S. 3/21/12)

A letter was sent to the Honorable Judge Joan A. Lenard dismissing my attorney due to ineffective counsel dated December 8, 2009 (See Exhibit "F")

EXHIBIT "A"

draft - Yahoo! Mail                                    http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2653&filt

# YAHOO!® MAIL
### Classic

**draft**                                                      Sunday, February 1, 2009 1:17 PM
**From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>
**To:** scarletduarte@yahoo.com

Scarlet, the following is a draft of what I propose to sent to Marc Osborne.  What does he think you knew?  Please respond with comment or correction.  Bill Norris

Marc, I met for several hours yesterday with Scarlett Duarte. We reviewed the superseding indictment, went through the plea agreement and went, word for word, though the proposed factual proffer.  Most of what she did is readily provable.  What she knew is more problematical. The proffer is a real problem.

Ms. Duarte wants very much to put this behind her.  She does not want to endure a long trial.  However, I don't think she can get through a Rule 11 colloquy in a plea to money laundering,

The core problem is that she had no dealings with New Hope .  She had met, socially at Sotto's home, a nurse who worked there and one of the owners, but she had no idea that they were engaged in medicare fraud.  She is adamant about that, and the discovery gives no hint that she did in fact know about this fraud.  Your proffer suggests that she had worked for Sotto doing medical billing before she received the checks but this in not true.  I have not reviewed the billing practices.  There may be something in the billing practice  that would lead someone to realize that this was bogus, but Ms. Duarte did not work in medical billing until after she had deposited the four checks at issue.

In the meantime, she cannot truthfully say that she was engaged in laundering proceeds of illegal activity at New Hope .

Ms. Duarte tells me that Sotto came from a family with money and had a successful company of her own.  Duarte believed, although Sotto never expressly said so, that the checks were to divert income to evade taxes.  Sotto told her exactly what to do.  The income tax evasion purpose is consistent with the notations on the Falcon Transportation checks.  They make it appear to be business expenses, which makes the funds tax exempt.  If it were money laundering, this subterfuge would have served no purpose.  Money laundering is, after all, hiding the source of the money.

If, as you believe, Ms. Duarte was helping Sotto launder New Hope money, why didn't that continue when she went to work for Sotto doing medical billing?

I explained to Ms. Duarte that what she was doing was income tax evasion, which is a federal felony.  She is willing to plead to an information to that effect.

I understand that you wish to have Ms. Duarte on one side of the line or the other immediately.  Can we meet, with Ms. Duarte in attendance, on Monday?

Bill Norris

---

From Wall Street to Main Street and everywhere in between, stay up-to-date with the latest news.

---

second draft - Yahoo! Mail                          http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2649&filt.



**second draft**                                                    Sunday, February 1, 2009 2:47 PM
  **From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>
    **To:** scarletduarte@yahoo.com

Scarlet, the following is a draft of what I propose to sent to Marc Osborne.  What does he think you knew?  Please respond with comment or correction.  Bill Norris

Marc, I met for several hours yesterday with Scarlet Duarte. We reviewed the superseding indictment, went through the plea agreement and went, word for word, though the proposed factual proffer.  Most of what she did is readily provable.  What she knew is more problematical. The proffer is a real problem.

At the outset, she wants you to know that she did not testify for Diana Sotto willingly.  She was subpoenaed four times and hired a lawyer to help her got out of it.  He, Alan Kaiser, told her she had no choice.  She has reviewed her testimony.  There are some things she could say better, but she told the truth as she understands it.

Ms. Duarte wants very much to put this behind her.  She does not want to endure a long trial.  However, I don't think she can get through a Rule 11 colloquy in a plea to money laundering,

The core problem is that she had no dealings with New Hope .  She had met, socially at Sotto's home, a nurse who worked there and one of the owners, but she had no idea that they were engaged in medicare fraud. She is adamant about that, and the discovery gives no hint that she did in fact know about this fraud.  Your proffer suggests that she had worked for Sotto doing medical billing before she received the checks but this in not true.  I have not reviewed the billing practices.  There may be something in the billing practice  that would lead someone to realize that this was bogus, but Ms. Duarte did not work in medical billing until after she had deposited the four checks at issue.

In the meantime, she cannot truthfully say that she was engaged in laundering proceeds of illegal activity at New Hope .

Ms. Duarte tells me that Sotto came from a family with money and had a successful company of her own.  Duarte believed, although Sotto never expressly said so, that the checks were to divert income to evade taxes.  Sotto told her exactly what to do.  The income tax evasion purpose is consistent with the notations on the Falcon Transportation checks.  They make it appear to be business expenses, which makes the funds tax exempt.  If it were money laundering, this subterfuge would have served no purpose.  Money laundering is, after all, hiding the source of the money.

If, as you believe, Ms. Duarte was helping Sotto launder New Hope money, why didn't that continue when she went to work for Sotto doing medical billing?

I explained to Ms. Duarte that what she was doing was income tax evasion, which is a federal felony.  She is willing to plead to an information to that effect.

second draft - Yahoo! Mail                                    http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2649&filt.

I understand that you wish to have Ms. Duarte on one side of the line or the other immediately. Can we meet, with Ms. Duarte in attendance, on Monday?

Bill Norris

---

From Wall Street to Main Street and everywhere in between, stay up-to-date with the latest news.

---

Fwd: Scarlet Duarte - Yahoo! Mail                    http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2648&filt...

# YAHOO!® MAIL Classic

**Fwd: Scarlet Duarte**                                          Sunday, February 1, 2009 4:25 PM

   **From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>

     **To:** scarletduarte@yahoo.com

       1 File (12KB)



Scarlet Duar

---

From Wall Street to Main Street and everywhere in between, stay up-to-date with the latest news.

> **Forwarded Message: Scarlet Duarte**
>
> **Scarlet Duarte**
>
>                                                               Sunday, February 1, 2009 4:20 PM
>
>    **From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>
>
>      **To:** Marc.Osborne@usdoj.gov
>
> Marc, I met for several hours yesterday with Scarlet Duarte. We reviewed the superseding indictment, went through the plea agreement and went, word for word, though the proposed factual proffer. Most of what she actually did is readily provable. There are bank records to prove it and witness interviews to support it. What she knew is more problematical. The proffer is a real problem.
>
> At the outset, she wants you to know that she did not testify for Diana Sotto willingly. She was subpoenaed four times and went to her lawyer to help her got out of it. He, Alan Kaiser, told her she had no choice, that she had to go. He told her that he had been subpoenaed, also. She has reviewed her testimony. There are some things she could say better, but she told the truth as she understands it.
>
> Ms. Duarte wants very much to put this behind her. She does not want to endure a long trial. However, I don't think she can get through a Rule 11 colloquy in a plea to money laundering,
>
> The core problem is that she had no dealings with New Hope . She had met, socially at a party put on by Luis Fernandez, a nurse who worked there. My notes show that this was a "Fifteenth" put on by Fernandez. Ms. Duarte had met, obviously, Luis Fernandez. She had no idea that they were engaged in medicare fraud. She is adamant about that, and the discovery gives no hint that she did in fact know about this fraud.
>
> Your proffer suggests that she had worked for Sotto doing medical billing before she received the checks but this is not true. I have not reviewed the billing practices. There may be something in

the billing practice  that would lead someone to realize that this was bogus, but Ms. Duarte did not work in medical billing until after she had deposited the four checks at issue.

In the meantime, she cannot truthfully say that she was engaged in laundering proceeds of illegal activity at New Hope .

Ms. Duarte tells me that Sotto came from a family with money and had a successful company of her own, the medical billing company.  Duarte believed, although Sotto never expressly said so, that the checks were to divert income to evade taxes.  Sotto told her exactly what to do.  The income tax evasion purpose is consistent with the notations on the Falcon Transportation checks. They make it appear to be business expenses, which makes the funds tax exempt.  If it were money laundering, this subterfuge would have served no purpose.  Money laundering is, after all, hiding the source of the money.

If, as you believe, Ms. Duarte was helping Sotto launder New Hope money, why didn't that continue when she went to work for Sotto doing medical billing?

I explained to Ms. Duarte that what she was doing was income tax evasion, which is a federal felony.  She is willing to plead to an information to that effect.

I understand that you wish to have Ms. Duarte on one side of the line or the other immediately. Can we meet, with Ms. Duarte in attendance, on Monday?

Bill Norris

From Wall Street to Main Street and everywhere in between, stay up-to-date with the latest news.

Fwd: Scarlet Duarte - Yahoo! Mail                          http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2647&filt...



**Fwd: Scarlet Duarte**                                                    Monday, February 2, 2009 1:40 PM
   **From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>
     **To:** scarletduarte@yahoo.com

Scarlet, FYI, Bill

> From: Marc.Osborne@usdoj.gov
> To: WNorrisLaw@aol.com
> Sent: 2/2/2009 12:17:02 P.M. Eastern Standard Time
> Subj: RE: Scarlet Duarte
>
> Bill, as I understand your email, the problem with the proffer is that she contends that she didn't know the
> money was proceeds of a crime. (There's no requirement that she know what crime it was, of course.) If she
> wants to plead to tax fraud, I will investigate whether that is feasible and acceptable to us (all tax cases have to
> be approved in Washington and at higher levels in my office) and get back to you asap.

> From: WNorrisLaw@aol.com [mailto:WNorrisLaw@aol.com]
> Sent: Sunday, February 01, 2009 4:20 PM
> To: Osborne, Marc (USAFLS)
> Subject: Scarlet Duarte
>
> Marc, I met for several hours yesterday with Scarlet Duarte. We reviewed the superseding
> indictment, went through the plea agreement and went, word for word, though the proposed factual
> proffer. Most of what she actually did is readily provable. There are bank records to prove it and
> witness interviews to support it. What she knew is more problematical. The proffer is a real
> problem.
>
> At the outset, she wants you to know that she did not testify for Diana Sotto willingly. She was
> subpoenaed four times and went to her lawyer to help her got out of it. He, Alan Kaiser, told her she
> had no choice, that she had to go. He told her that he had been subpoenaed, also. She has
> reviewed her testimony. There are some things she could say better, but she told the truth as she
> understands it.
>
> Ms. Duarte wants very much to put this behind her. She does not want to endure a long trial.
> However, I don't think she can get through a Rule 11 colloquy in a plea to money laundering,
>
> The core problem is that she had no dealings with New Hope. She had met, socially at a party put
> on by Luis Fernandez, a nurse who worked there. My notes show that this was a "Fifteenth" put on
> by Fernandez. Ms. Duarte had met, obviously, Luis Fernandez. She had no idea that they were
> engaged in medicare fraud. She is adamant about that, and the discovery gives no hint that she did
> in fact know about this fraud.
>
> Your proffer suggests that she had worked for Sotto doing medical billing before she received the
> checks but this is not true. I have not reviewed the billing practices. There may be something in the
> billing practice that would lead someone to realize that this was bogus, but Ms. Duarte did not work
> in medical billing until after she had deposited the four checks at issue.
>
> In the meantime, she cannot truthfully say that she was engaged in laundering proceeds of illegal
> activity at New Hope.

Fwd: Scarlet Duarte - Yahoo! Mail                    http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2647&filt.

Ms. Duarte tells me that Sotto came from a family with money and had a successful company of her own, the medical billing company.  Duarte believed, although Sotto never expressly said so, that the checks were to divert income to evade taxes.  Sotto told her exactly what to do.  The income tax evasion purpose is consistent with the notations on the Falcon Transportation checks.  They make it appear to be business expenses, which makes the funds tax exempt.  If it were money laundering, this subterfuge would have served no purpose.  Money laundering is, after all, hiding the source of the money.

If, as you believe, Ms. Duarte was helping Sotto launder New Hope money, why didn't that continue when she went to work for Sotto doing medical billing?

I explained to Ms. Duarte that what she was doing was income tax evasion, which is a federal felony.  She is willing to plead to an information to that effect.

I understand that you wish to have Ms. Duarte on one side of the line or the other immediately.  Can we meet, with Ms. Duarte in attendance, on Monday?

Bill Norris

From Wall Street to Main Street and everywhere in between, stay up-to-date with the latest news.

Stay up to date on the latest news - from sports scores to stocks and so much more.

Re: Scarlet Duarte - Yahoo! Mail                                http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2646&filt..



### Re: Scarlet Duarte                                              Tuesday, February 3, 2009 9:16 AM

**From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>
**To:** scarletduarte@yahoo.com

I did send him a thank-you.  Right know he is looking into whether he is authorized to proceed.  There are special rules for tax charges.  Bill

In a message dated 2/2/2009 8:33:04 P.M. Eastern Standard Time, scarletduarte@yahoo.com writes:

> Hi Mr. Norris:
>
> I was wondering if you had responded to Mr. Osbourne?  If you have not, I was thinking that maybe we should thank him for considering our offer.  I think that remaining humble may help.  Also, what about our meeting with him.
>
> What do you think?
>
>
> --- On **Mon, 2/2/09, WNorrisLaw@aol.com** *<WNorrisLaw@aol.com>* wrote:
>
>> From: WNorrisLaw@aol.com <WNorrisLaw@aol.com>
>> Subject: Fwd: Scarlet Duarte
>> To: scarletduarte@yahoo.com
>> Date: Monday, February 2, 2009, 1:40 PM
>>
>>
>> Scarlet, FYI, Bill
>>
>>> From: Marc.Osborne@usdoj.gov
>>> To: WNorrisLaw@aol.com
>>> Sent: 2/2/2009 12:17:02 P.M. Eastern Standard Time
>>> Subj: RE: Scarlet Duarte
>>>
>>> Bill, as I understand your email, the problem with the proffer is that she contends that she didn't know the money was proceeds of a crime.  (There's no requirement that she know what crime it was, of course.)  If she wants to plead to tax fraud, I will investigate whether that is feasible and acceptable to us (all tax cases have to be approved in Washington and at higher levels in my office) and get back to you asap.
>>>
>>> **From:** WNorrisLaw@aol.com [mailto:WNorrisLaw@aol.com]
>>> **Sent:** Sunday, February 01, 2009 4:20 PM
>>> **To:** Osborne, Marc (USAFLS)
>>> **Subject:** Scarlet Duarte
>>>
>>> Marc, I met for several hours yesterday with Scarlet Duarte. We reviewed the superseding indictment, went through the plea agreement and went, word for word, though the proposed factual proffer.  Most of what she actually did is readily provable.  There are bank records to prove it and witness interviews to support it.

What she knew is more problematical. The proffer is a real problem.

At the outset, she wants you to know that she did not testify for Diana Sotto willingly.  She was subpoenaed four times and went to her lawyer to help her got out of it.  He, Alan Kaiser, told her she had no choice, that she had to go.  He told her that he had been subpoenaed, also.  She has reviewed her testimony.  There are some things she could say better, but she told the truth as she understands it.

Ms. Duarte wants very much to put this behind her.  She does not want to endure a long trial.  However, I don¢t think she can get through a Rule 11 colloquy in a plea to money laundering,

The core problem is that she had no dealings with New Hope.  She had met, socially at a party put on by Luis Fernandez, a nurse who worked there.  My notes show that this was a "Fifteenth" put on by Fernandez.  Ms. Duarte had met, obviously, Luis Fernandez.  She had no idea that they were engaged in medicare fraud.  She is adamant about that, and the discovery gives no hint that she did in fact know about this fraud.

Your proffer suggests that she had worked for Sotto doing medical billing before she received the checks but this is not true.  I have not reviewed the billing practices.  There may be something in the billing practice  that would lead someone to realize that this was bogus, but Ms. Duarte did not work in medical billing until after she had deposited the four checks at issue.

In the meantime, she cannot truthfully say that she was engaged in laundering proceeds of illegal activity at New Hope.

Ms. Duarte tells me that Sotto came from a family with money and had a successful company of her own, the medical billing company.  Duarte believed, although Sotto never expressly said so, that the checks were to divert income to evade taxes.  Sotto told her exactly what to do.  The income tax evasion purpose is consistent with the notations on the Falcon Transportation checks.  They make it appear to be business expenses, which makes the funds tax exempt.  If it were money laundering, this subterfuge would have served no purpose.  Money laundering is, after all, hiding the source of the money.

If, as you believe, Ms. Duarte was helping Sotto launder New Hope money, why didn¢t that continue when she went to work for Sotto doing medical billing?

I explained to Ms. Duarte that what she was doing was income tax evasion, which is a federal felony.  She is willing to plead to an information to that effect.

I understand that you wish to have Ms. Duarte on one side of the line or the other immediately.  Can we meet, with Ms. Duarte in attendance, on Monday?

Bill Norris

---

From Wall Street to Main Street and everywhere in between, stay up-to-date with the latest news.

---

Stay up to date on the latest news - from sports scores to stocks and so much more.

Stay up to date on the latest news - from sports scores to stocks and so much more.

Fwd: Scarlet Duarte - Yahoo! Mail                    http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2644&filt...



**Fwd: Scarlet Duarte**                                        Sunday, February 8, 2009 1:31 PM
**From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>
**To:** scarletduarte@yahoo.com

FYI

---

From: WNorrisLaw
To: Marc.Osborne@usdoj.gov
Sent: 2/8/2009 1:30:50 P.M. Eastern Standard Time
Subj: Scarlet Duarte

Marc:

 I intended to telephone you on Friday, but things got hectic and I decided that it would make more sense to write over the weekend.

 First, I would like to thank you for extending time for Scarlet Duarte to decide what to do.  It was not an easy week for her, but it gave us the time to considered most everything.  The bottom line is that she recognizes that she may be convicted and spend more time in jail, but she cannot plead guilty and go to jail for something she does not believe she did..

 Second, she does recognize that her conduct may constitute an attempt at income tax evasion, and she remains willing to plead to an information charging her with that, but in line with her actual conduct.

 Bill Norris

---

Who's never won? Biggest Grammy Award surprises of all time on AOL Music.

---

Who's never won? Biggest Grammy Award surprises of all time on AOL Music.

Fwd: Scarlet Duarte - Yahoo! Mail                    http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2643&filt.



### Fwd: Scarlet Duarte

Monday, February 9, 2009 9:58 AM

**From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>
**To:** scarletduarte@yahoo.com
    1 File (10KB)



RE: Scarlet I

---

Who's never won? Biggest Grammy Award surprises of all time on AOL Music.

---

**Forwarded Message: RE: Scarlet Duarte**

### RE: Scarlet Duarte

Monday, February 9, 2009 9:40 AM

**From:** "Osborne, Marc (USAFLS)" <Marc.Osborne@usdoj.gov>
   **To:** WNorrisLaw@aol.com

Thanks for letting me know your status.  I would never want Ms. Duarte to plead to anything other than her actual conduct.  If she had reasonably foreseen that she was a small part of a larger conspiracy that failed to pay a million and a half dollars in taxes (I have no evidence of that, but she would know, obviously), she could have pleaded to that, and I would have dropped the laundering.  I understand your email to indicate that she didn't foresee the extent of the tax fraud.  Therefore, she can't plead to a tax charge in return for my dismissal of the laundering charges, and the laundering will have to be tried.

---

**From:** WNorrisLaw@aol.com [mailto:WNorrisLaw@aol.com]
**Sent:** Sunday, February 08, 2009 1:31 PM
**To:** Osborne, Marc (USAFLS)
**Subject:** Scarlet Duarte

Marc:

I intended to telephone you on Friday, but things got hectic and I decided that it would make more sense to write over the weekend.

First, I would like to thank you for extending time for Scarlet Duarte to decide what to do.  It was not an easy week for her, but it gave us the time to considered most everything.  The bottom line is that she recognizes that she may be convicted and spend more time in jail, but she cannot plead guilty and go to jail for something she does not believe she did..

Second, she does recognize that her conduct may constitute an attempt at income tax evasion, and she remains willing to plead to an information charging her with that, but in line with her actual conduct.

Bill Norris

Calendar Call - Yahoo! Mail                                      http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2639&filt.



**Calendar Call**                                                Thursday, March 26, 2009 8:18 PM

**From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>
**To:** scarletduarte@yahoo.com

Scarlet, Judge Leonard has set a conference in your case for 2PM on March 30, 2009.  This will be in her
courtroom in the "new" building.  She expects you to be there.  Bill Norris

Feeling the pinch at the grocery store? <u>Make dinner for $10 or less</u>.

Fwd: Scarlet Duarte - Yahoo! Mail                    http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2643&filt.

Who's never won? Biggest Grammy Award surprises of all time on AOL Music.

Re: Scarlet Duarte - Yahoo! Mail                                    http://us.mc1136.mail.yahoo.com/mc/showMessage?sMid=2642&filt.



### Re: Scarlet Duarte
Monday, February 9, 2009 3:22 PM

**From:** "WNorrisLaw@aol.com" <WNorrisLaw@aol.com>

**To:** scarletduarte@yahoo.com

He was covering himself.  He referred to the extent of the tax fraud as $1.2 million, the amount it would have to be to get you to the same level as $200,000 of money laundering.

---

The year's hottest artists on the red carpet at the Grammy Awards. **AOL Music takes you there**.

---

EXHIBIT "B"

| **Message0502** | |
|---|---|
| **Subject:** | RE: invoice |
| **From:** | "Duarte, Scarlet" <sduarte@snd.com> |
| **Date:** | Fri, 13 Aug 2004 15:43:49 -0400 |
| **To:** | 'Diana Sotto' <dianasotto@bellsouth.net> |

| **Message Body** |
|---|

DO YOU STILL WANT ME TO FAX THEM....OR JUST TAKE THEM WITH ME....

-----Original Message-----
**From:** Diana Sotto [mailto:dianasotto@bellsouth.net]
**Sent:** Friday, August 13, 2004 1:46 PM
**To+++++>** Scarlet Duarte
**Subject:** invoice

**Please make an invoice for M & C Health Center dated TODAY for $ 40,000.00 even......they will be arriving here in an hour so if you want to fax me the other ones w/this one that would be kewl...... "D". when you are ready call me on the cell so I can stand by the fax machine 305-666-5548**

| **Main Message Header** |
|---|

++++rn-Path: <sduarte@snd.com>
Received: from cyclops.snd.com ([208.215.184.3])
        by imfl4aec.mail.bellsouth.net
        (InterMail vM.5.01.06.08 201-253-122-130-108-20031117) with ESMTP
        id <20040813194351.JIIP1798.imfl4aec.mail.bellsouth.net@cyclops.snd.com>
        for <dianasotto@bellsouth.net>; Fri, 13 Aug 2004 15:43:51 -0400
Received: from mercury.snd.com ([172.16.10.8]) by cyclops.snd.com with InterScan Messaging
Security Suite; Fri, 13 Aug 2004 15:43:42 -0400
Received: by++++cury.snd.com with Internet Mail Service (5.5.2658.3)
        id <QG8X3DRL>; Fri, 13 Aug 2004 15:43:49 -0400
Message-ID: <8CFE5CB1ADA31B43AA829179D9BFDD7401A07F90@mercury.snd.com>
From: "Duarte, Scarlet" <sduarte@snd.com>
To: 'Diana Sotto' <dianasotto@bellsouth.net>
Subject: RE: invoice
Date: Fri, 13 Aug 2004 15:43:49 -0400
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2658.3)
Content-Type: multipart/alternative;
        boundary="---- = NextPart_001_01C4816D.8E041B8E"

| **Sub Header** |
|---|

Content-Type: text/plain;
        charset="iso-8859-1"

| **Sub Header** |
|---|

Content-Type: text/html;
        charset="iso-8859-1"

010218

EXHIBIT "C"

1

```
1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                         MIAMI DIVISION
                 CASE NO. 08-20851-CRIMINAL-LENARD
3

4      UNITED STATES OF AMERICA,          Miami, Florida

5                     Plaintiff,          February 19, 2010

6            vs.

7      SCARLET DUARTE,                    2:46 p.m. to 5:28 p.m.

8                     Defendant.          Pages 1 to 82

9      ─────────────────────────────────────────────────────

10
                            SENTENCING HEARING
11           BEFORE THE HONORABLE JOAN A. LENARD,
                   UNITED STATES DISTRICT JUDGE
12

13
       APPEARANCES:
14

15     FOR THE GOVERNMENT:       MARC OSBORNE, ESQ.
                                 ASSISTANT UNITED STATES ATTORNEY
16                               99 Northeast Fourth Street
                                 Miami, Florida 33132
17

18     FOR THE DEFENDANT:        NELSON RODRIGUEZ-VARELA, ESQ.
                                 Two Alhambra Plaza, Suite 112
19                               Coral Gables, Florida 33134

20
       FOR US PROBATION:         MICHELLE BURGESS
21

22     REPORTED BY:             LISA EDWARDS, CRR, RMR
                                 Official Court Reporter
23                               400 North Miami Avenue
                                 Twelfth Floor
24                               Miami, Florida 33128
                                 (305) 523-5499
25
```

2

1    THE COURT: Good afternoon. You may be seated.

2    United States of America versus Scarlet Duarte, Case

3    No. 08-20851.

4    Good afternoon, counsel and Probation.

5    State your appearances, please, for the record.

6    MR. OSBORNE: Good afternoon, your Honor.

7    Marc Osborne on behalf of the United States.

8    THE COURT: Good afternoon.

9    MR. RODRIGUEZ-VARELA: Good afternoon, your Honor.

10    Nelson Rodriguez-Varela on behalf of Scarlet Duarte,

11    who is present before the Court.

12    THE COURT: Good afternoon.

13    THE PROBATION OFFICER: Good afternoon, your Honor.

14    Michelle Burgess on behalf of United States

15    Probation.

16    THE COURT: Good afternoon.

17    Ms. Duarte is set for sentencing today.

18    Ms. Duarte, have you read the revised advisory

19    presentence investigation report and its addendums?

20    THE DEFENDANT: Yes, I have.

21    THE COURT: And have you and your attorney discussed

22    the revised advisory presentence investigation report and its

23    addendums?   DEF. ACCEPTING.

24    THE DEFENDANT: Yes, we have.

25    THE COURT: Now, prior counsel had filed objections

3

1    to the -- well, he filed objections on November 30th to the

2    original report and then filed a supplement to the Defendant's

3    objections on December 8th.

4    The Government filed a response and a motion for

5    upward departure.

6    Are you still proceeding on those objections --

7    MR. RODRIGUEZ-VARELA: Yes, Judge.

8    THE COURT: -- Mr. Rodriguez-Varela.

9    MR. RODRIGUEZ-VARELA: Yes, I am.

10    THE COURT: Okay. So you wish to be heard?

11    MR. RODRIGUEZ-VARELA: Thank you, your Honor.

12    Judge, you heard the trial. You know what the facts

13    are on the case, what the witnesses said, how they testified.

14    And, obviously, every appellate level seems to think that the

15    Court is in the best position to gauge credibility.

16    At this point, we accept, obviously, the verdict that

17    was given by the jury in this case.

18    There are certain things that we'd like to challenge

19    in terms of the computation of the sentence, which at this

20    point puts the Defendant at a Level 28, which -- it's basically

21    78 to 97 months.

22    The first level -- the first point that the PSI makes

23    here is the base offense level. The base offense level is

24    calculated here based upon the value of the monetary funds

25    being in excess of $400,000, but not more than a million

4

1    dollars.

2    The indictment that was returned by the grand jury in

3    this case alleges for purposes of determining the counts -- and

4    let me just backtrack.

5    There are certain companies that give rise to the

6    amount of relevant conduct in this case. One is SND. The

7    other one is Falcon Transport. The other one is known as

8    24-Hour. And the other one is known as MD Billing.

9    Each of these companies, your Honor, is alleged to

10    have received funds from a company that was committing Medicare

11    fraud. From those companies, checks were issued in order for

12    them to be cashed.

13    The checks were made out to different individuals.

14    Different individuals cashed those checks. The money came back

15    and it was given to an individual by the name of Sotto.

16    Now, obviously, the Court understands -- and I'm not

17    going to dwell too much on this -- the Defendant did not have

18    absolutely anything to do with the scheme that gave rise to the

19    actual theft of money from Medicare.

20    She didn't set up the clinics. She did not operate

21    the clinics. She did not create any entity whatsoever in order

22    to commit that fraud.

23    Her portion of the involvement in this particular

24    case, we would submit -- it's all one conspiracy. We would

25    suggest that her part is only in these companies and the

5

1    monetary funds that were -- that transit through these

2    companies.

3    Now, the first one, being SND -- an amount of 348,033

4    was the totality of the funds that went through SND.

5    Now, if we recall the testimony that was given at

6    trial, SND was set up under the name of the Defendant, Scarlet

7    Duarte. But it was set up by Diana Sotto.

8    Diana Sotto sent to the Department of State the

9    incorporation documents. Diana Sotto was the one that had the

10    connection at La Bamba. Because, if you recall, this company

11    did not even have a bank account.

12    This company is the company that would cash checks at

13    a check-cashing place called La Bamba, which it's very unusual

14    for a company not to have a bank account and to be cashing

15    checks at La Bamba. But, nonetheless, that is exactly what

16    happened here.

17    So two checks are alleged in the indictment through

18    SND as to Defendant Scarlet Duarte. One is Count 19 in the

19    amount of $40,000. The other one is Count 20 in the amount of

20    $14,000. Those are the two checks coming from either M&C or --

21    which is, of course, money that's coming from Project New Hope.

22    So those are the only two checks that Scarlet Duarte

23    really had anything to do with. Because, if we look at the

24    testimony at the trial, every other check that came in through

25    that business that was cashed at La Bamba was negotiated by

6

1  Diana Sotto.

2      It was Diana Sotto's handwriting.  It was Diana

3  Sotto's endorsement.  It was Diana Sotto who received the bulk

4  of the money from that company.

5      Now, if Scarlet Duarte is allegedly receiving some

6  amount from cashing those checks at La Bamba and she has to do

7  at least tangentially with the 40,000 and the 14,000, it's

8  entirely understandable and quite possible that Ms. Sotto would

9  have Scarlet Duarte in the dark about what else is being

10 received through that company.

11     So it becomes an issue of foreseeability, whether it

12 is foreseeable for Scarlet Duarte to realize the amount of

13 money that is going through SND and going through the

14 check-cashing business at La Bamba.

15     Even in the case of the 40,000 and even in the case

16 of the 14,000, the testimony at trial was that it was not

17 Scarlet Duarte's handwriting, that it looked more like the

18 handwriting of Ms. Sotto.

19     Ms. Sotto is the person who has orchestrated and was

20 the architect of every single device that was used to launder

21 monetary proceeds from Project New Hope and their extensive

22 fraud committed against Medicare.  And was convicted

                                                of money laundering

23     So while we accept the jury verdict, while we accept

24 that the Defendant was convicted of Counts 19 and 20, we would

25 submit that the rest of the money that came in through that

---

7

1  business was not known by Scarlet Duarte, was not negotiated by

2  Scarlet Duarte.  She did not partake or receive any benefit

3  from those monies that came in through SND.

4      And I think that, in order for us to make that

5  assessment, one of the important things that we should consider

6  is the testimony of Maria Loriga.

7      The testimony of Maria Loriga talks a little bit

8  about that in terms of how Scarlet Duarte came to have a role

9  in this otherwise extensive conspiracy without really having

10 very much knowledge about all of the factors that surrounded

11 it.

12     To use her words, indicating that Scarlet -- as

13 she -- she was using her on a way to get the money out.  And I

14 think that that is a lot of what happened in this case.  A lot

15 of what happened in this case -- before we come to court and

16 before people testify and before people put their foot in their

17 mouth when they take the stand, they make their own decisions.

18     Now, while she's making her own decisions, we have a

19 very savvy criminal, because Ms. Sotto knows how to steal the

20 money from the Medicare.  Ms. Sotto knows what codes to use.

21 Ms. Sotto knows how to advise the clinic owners as to what

22 Medicare is paying for.  And Ms. Sotto certainly knows how to

23 control the flow of money throughout.

24     She would have been in an excellent position, taking

25 advantage of the lack of knowledge -- lack of prior knowledge

---

8

1  by the Defendant as to how those things are done and, in

2  addition to that, taking advantage of a purported friendship,

3  putting Scarlet Duarte in a position where she may be acting

4  consistent with the objectives of the conspiracy, yet not

5  knowing all the details.  And I think that, more than anything,

6  she was used in a way to get the money out.

7      Now, if you think about it, who's the one that has

8  the most exposure here in terms of being able to determine who

9  was laundering the money?  Scarlet Duarte.  She's the one

10 that's writing the checks.  She's the one that's receiving the

11 money.  She's the one that's turning over the money to

12 Ms. Sotto.  She is the one that almost anybody can use to do

13 that job.

14     Now, the smart ones stay away from that trade.  The

15 smart ones are on the margin -- on the side, waiting to receive

16 that cash from a person like Scarlet Duarte, an

17 unsophisticated, unknowing, trusting individual, and waiting

18 for that money to come back into their grubby hands.

19     They're the ones that are engaged in the fraud.

20 They're the ones that are getting the lion's share of the

21 funds.  And more than anything, your Honor, they are the ones

22 that are going to be less likely to want to share those

23 proceeds whenever appropriate.

24     That's why Scarlet Duarte thinks that that company

25 was not generating any funds, that it wasn't working anymore,

---

9

1  that it wasn't receiving any money and, basically, that it was

2  dormant and that it would expire at the end of the year because

3  of lack of any kind of movement or business, if you will.

4      So insofar as our challenge to that, we believe,

5  based on those factors, that the amount of money that was

6  received through SND beyond the 40 and the 14 in Counts 19 and

7  20 would not have been foreseeable to Scarlet Duarte, given the

8  manner in which Ms. Sotto set up this entire scheme.

9      So if we believe that, then the Defendant would not

10 be at an offense level of 22.  She would be at an offense level

11 of 20, because she would be below the 400,000-dollar

12 requirement that is Level 22.

13     I don't know if you want me to proceed through all my

14 objections or you want me to go one by one.  However the Court

15 wants me to do it.

16     THE COURT:  Go ahead.  Keep going.

17     MR. RODRIGUEZ-VARELA:  Okay.  The next issue, your

18 Honor, that I'd like to address is the issue of sophisticated

19 laundering.  And the issue of sophisticated laundering is

20 governed by 2S1.1, right -- 2S1.1(b)(3)?

21     The way that the laundering was set up in this case

22 is almost like if a child would have done it.  The idea of

23 going to a check-cashing place to cash checks from a

24 business -- now, remember that Scarlet doesn't set up these

25 transactions.

10

1    Now, while she may have participated in a manner that
2    is consistent with some of those objectives as it is read in
3    the instruction of conspiracy, it was -- she was basically put
4    in a position where, "I have created these things for you and
5    this is how you're going to run it.  And, eventually, you're
6    going to have your own business and you're going to make your
7    money and you're going to be in the same position as me."
8        And, if you think about it, look at the relative
9    position of the parties.  Scarlet Duarte doesn't even have
10   money to buy the uniforms for her kids for school and, on the
11   other hand, Ms. Sotto drives the great car, lives in the big
12   house and has all the money.
13       So she's going with what Ms. Sotto is telling her,
14   saying, "Look, this is how we're doing it.  This is my
15   business.  This is how you get started.  This is how you do it.
16   This is what I want you to do."  And she is acting in a manner
17   that is consistent with that.
18       But in terms of sophisticated laundering, you have a
19   person that, at most, created a company so that checks could be
20   received and checks could be written and cashed.
21       I mean, the business is not investing in futures.
22   The business is not investing in real estate transactions.
23   They're not involved in any kind of credible conduct to
24   demonstrate and hide funds that were coming from an illicit
25   purpose.

11

1    Rather, they're getting the idiot here to go cash
2    checks, to write checks to her friends so that they could go
3    cash them God knows where, come back, "Here's the money" and
4    she turns around and gives the money to Sotto.
5        How sophisticated is that?  That is the most
6    ridiculous way and the easiest way to be caught doing something
7    illegal, which is exactly what happened in this case.
8        It wasn't very hard for the FBI to come and knock on
9    her door and say, "Hey, Scarlet," you know, all these checks,
10   because her hand is all over them.  It was done almost in a
11   thoughtless way.  It was done by someone who has no idea what
12   she's doing.
13       It is so ridiculously easy to catch Scarlet Duarte
14   that all they had to do was track down the money and ask her
15   what she thought that money was coming from.  Where do you
16   think that money is coming from?
17       And that is her biggest problem in this case, the
18   issue of deliberate ignorance and the things that happened
19   during the trial, which we'll address in a minute, but has
20   nothing to do with that.
21       I think -- and I think it is the case law -- when the
22   Sentencing Commission created a two-point enhancement for
23   sophisticated laundering under (b)(3), they envisioned people
24   acting as businessmen who created entities that truly would
25   disguise the source of the funds, not merely serve as a cashing

12

1    house, as a punk writing checks where she's easily going to be
2    caught in every way without any question that, when they come
3    knocking on the door, it's going to be easy to see Project New
4    Hope, to account so-and-so.
5        "Let me see account" -- so-and-so.  Oh, Scarlet
6    Duarte.  "Scarlet, these checks to your friends, cashing the
7    money.  Here's the money."  The money goes to the other -- it's
8    like a child did it.  There's nothing sophisticated about it.
9        The Court has been sitting as a judge for a very long
10   time.  The Court has seen some of the very, very complicated
11   transactions and lengths that people go through to launder
12   large amounts of monetary proceeds, the use of offshore
13   accounts, the use of -- businesses transacting business in
14   Malaysia, an individual bringing a suitcase full of money that
15   later ends up being invested in New York in some stock fraud,
16   things that are -- that even when seasoned investigators look
17   at them they say, "You know, it has gone through so many
18   levels" -- "levels" being the operative word that is being used
19   here, two or more levels, layering of transactions -- "It has
20   gone through so many layers that not even we can tell whether
21   the guy that took this money and wrote that check knew that the
22   money came from an unlawful purpose."
23       And that's what I have to say about sophisticated
24   laundering.
25       I think that she was basically -- as her prior

13

1    counsel said, it was not designed by Scarlet Duarte.  Nothing
2    in the scheme protected her.  To the contrary, the scheme was
3    designed to hang Scarlet Duarte out to dry.
4        They didn't bother to create different layers.  They
5    said, "You know what?  We're going to do it the easy way so I
6    can get my money in my pocket fast.  If they get caught, do you
7    know who they're going to go to?  Scarlet Duarte.  I'm going to
8    wash my hands and probably even convince the idiot here to go
9    and testify in my motion for new trial.  I will use her to help
10   me and I will clean my hands with her."
11       And that's exactly what they did in this case.
12   That's why we're looking at Scarlet Duarte here, looking almost
13   at the same amount of time as the leaders of this conspiracy,
14   which really should not be.  But, hey, when you go to trial and
15   you lose, anything is possible with the guidelines.
16       I'm not going to ask the Court to award acceptance of
17   responsibility here because, you know -- and I want to address
18   the issue of acceptance not because I'm asking you for
19   acceptance, but I want you to consider it in the context of
20   obstruction.
21       And I want the Court to also consider the issue
22   pertaining to whether the Defendant should have testified or
23   not, whether the Defendant in this case testified pursuant to
24   some crazy idea that the instruction of deliberate ignorance
25   would help her.

14

1      I think that that is something that has something to
2  do with this case and this sentencing this afternoon and has a
3  lot to do with a potential claim of ineffective assistance of
4  counsel.
5      I have never seen -- and I'm not saying that all
6  circumstances would prevent a defense attorney from saying it
7  because, frankly, I haven't looked at every possible situation
8  in the world.
9      But when we look at what happened in this case and
10 the fact that the defense attorney himself is requesting a
11 deliberate ignorance instruction, one would have to consider to
12 ask for a deliberate ignorance instruction in light of the
13 testimony that the Defendant gave.
14      And what did the Defendant say?  The Defendant said
15 that, basically, she didn't know what was going on with the way
16 that the money was being received.
17      And I don't think that anybody here said that Scarlet
18 had anything to do whatsoever with the procurement of the funds
19 from the Medicare system.  That was done by smart people, not
20 by Scarlet Duarte.
21      Then Scarlet takes the stand and -- and when we look
22 at the testimony of some of the other people, they're saying,
23 "Well, yeah.  She was present."
24      When some checks were given, she didn't negotiate the
25 checks because the handwriting isn't hers, you know, the

15

1  idiotic idea of Falcon Transport and 24-Hour, which we admit
2  that that is part of her relevant conduct.
3      But when we look at whether she obstructed justice by
4  her testimony and what she said, she basically admitted to a
5  crime on the stand.
6      She admitted to closing her eyes.  She admitted to
7  doing things that, if -- if anybody would have even said, "Let
8  me just ask one question.  Let me go to the bank -- let me look
9  at this.  Where are you getting all this money?" -- just one
10 question, just a very minor, "Let me look over your shoulder.
11 Let me see why you're doing all these things," you would have
12 realized that she is being deliberately ignorant.
13      And that is what she testified to.  Her testimony is
14 consistent and is the picture of deliberate ignorance.  And
15 then her attorney at the end of the case says, "Judge, give me
16 the deliberate ignorance instruction."
17      I cannot imagine under what circumstances a defense
18 attorney would come in and put their client on the stand after
19 having given a statement to the FBI in 2006, after having
20 testified on a motion for new trial of a Co-Defendant and after
21 considering the evidence -- the overwhelming evidence in this
22 case -- would have put her on the stand to admit that she
23 should have looked and that she looked the other way and that
24 she closed her eyes and then asked for deliberate ignorance.
25      It makes absolutely no sense in light of what she

16

1  testified.
2      And there's over 100 and somewhat pages of her
3  testimony that I went through a couple of times, looking at it
4  and thinking:  How in the world would this testimony help
5  Ms. Duarte be acquitted in a case where she's essentially
6  admitting the theory of the case is, "Let me admit to
7  deliberate ignorance.  Let me get the instruction.  And then
8  let's see what happens"?  That is crazy.
9      Not only did the Government have direct proof to
10 convict this woman, but she also helped them with her attorney
11 to convict her by saying, "You know what?  I should have
12 looked.  I should have known."
13      You know, she had no answers, Judge.  Most of the
14 time, she had no answers.
15      "What about the 40,000-dollar invoice?
16      "Oh, I don't remember.
17      "Well, what about this check?
18      "I don't remember.
19      "Well, what about this meeting?
20      "I don't know."
21      She had no business taking the stand.  She had no
22 business being in this trial with the amount of evidence that
23 we're looking at here.
24      And let me not bore you with more, but let me suggest
25 to you that the strategy was flawed, that her testimony was

17

1  guided by that strategy that made no sense whatsoever and that
2  her testimony in this case, rather than being obstruction of
3  justice, is almost a mindless admission to the counts alleged
4  in the indictment.
5      And once she finished testifying, the jury shouldn't
6  have taken more than 25 minutes in coming back with a verdict
7  of guilty against this woman based upon the things that she
8  said on the stand.
9      Her testimony was almost like saying, "You know, I
10 want the jury to acquit me because I'm stupid.  I want the jury
11 to acquit me because, you know what?  I looked the other way
12 and I really didn't know that," when you know that the law is
13 that you have to look, that you have to think, that you have to
14 go forward.
15      And she didn't because she's not the brightest apple
16 in the bunch.  She didn't because, quite frankly, she let
17 herself -- herself be led by a poisonous snake that is this
18 woman, Ms. Sotto, who even had the ability, Judge, to get
19 her -- and it's the transcript that I asked you to reset the
20 hearing because -- oh, I got it from counsel and I read it, not
21 as much as I'd like to read it, but I read it quickly, since I
22 got it this morning.
23      And I -- you know, she -- Sotto -- in the middle of
24 this firestorm with the FBI, with the Department of Justice,
25 with an indictment looming, she convinces Scarlet to come and

18

1    testify in her favor at her motion for new trial.  That is
2    crazy.  It is amazing, the control that this woman has over
3    Scarlet Duarte.
4        I cannot imagine any circumstances where somebody
5    would do something like that, except to say, "You're either
6    stupid or you love this woman for some reason or you're really
7    putting your head in the sand and you don't want to look
8    anywhere beyond just admitting, 'Oh, I trusted her.'
9        "And why did you do --
10       "I trusted her.
11       "Why did you --
12       "Oh, I trusted her."
13       What is that?  That is a plea of guilty.
14       "Mr. Osborne, what can I do for you?  How can I be
15   truthful about this?  Let me sit with the Government and let me
16   do what I have to do" and not come in, admit your guilt, get
17   the instruction of deliberate ignorance and go to the jury.
18       I don't even know how long the jury took -- how long
19   did the jury take to come back?
20       THE DEFENDANT:  I think in an hour.
21       MR. RODRIGUEZ-VARELA:  An hour.  Of course.  Of
22   course.
23       And they must have taken an hour because they needed
24   to determine where they're going to sit, you know, if they're
25   going to have lunch, if they're going to drink water, if

19

1    they're going to select a foreperson.
2        You know, I bet they didn't even sit there.  You
3    don't even need to discuss this for an hour.  "She's guilty.
4    She told us.  And the lawyer helped.  Deliberate ignorance.
5    The lawyer's giving us the road map to the conviction of this
6    person."
7        So I don't think she committed obstruction of
8    justice.  I don't think she came forward and lied on the stand.
9    I think more than anything she gave the Government a little
10   help in convicting her.
11       And I think that, of course, I'm not going to say
12   that you should award her points for accepting responsibility
13   because she clearly didn't, but I don't think that this -- in
14   spite of that, I don't think that the Court should also give
15   her two points for obstruction of justice, which is, I would
16   imagine -- and I have seen it -- just basically reserved for
17   the worst of the worst that come in here and blatantly lie
18   about things.
19       I think -- if anything, I think she helped the
20   Government a great deal.
21       The testimony that she gave -- and just a side note:
22   The testimony that she gave with respect to Diana Sotto in her
23   motion for new trial is accompanied by the order of the
24   Honorable Cecilia Altonaga -- and it's in addition to that part
25   of a very long -- lengthy transcript from Page 17 to

20

1    Page 70-something -- to Page 66 -- I don't think that should be
2    considered in this case.
3        It was not part of the trial.  I used it by reference
4    because it exacerbates the fact of the hold that this woman has
5    over Scarlet Duarte and I think it should be considered for
6    that purpose.
7        I don't think it establishes that she committed
8    perjury.  I don't think it establishes obstruction of justice.
9    It didn't happen through the course of this trial.  It was not
10   testimony that was believed or relied upon by anybody.  It did
11   not alter in any way the result of anything in this case.
12       And I don't think that it should be the basis for a
13   finding of a two-point upward adjustment under 2S1.1(b)(3),
14   obstruction of justice -- I'm sorry -- 3C1.1, obstruction of
15   justice.  I misspoke, and I called again the guideline for
16   sophisticated means.
17       And, your Honor, again, you sat through the course of
18   this trial.  You know better than me what her demeanor was when
19   she testified.  You know, the things that she said are in the
20   transcript.  But sometimes, when people say things and you're
21   present and you see them, you gather other things.
22       You're observant.  You've been doing this for a lot
23   longer than me.
24       I think that -- if you look at all the factors in
25   this case, I think that, even if you don't find me persuasive

21

1    with regards to the Level 20 instead of the Level 22 for the
2    base offense level, certainly the enhancement for obstruction
3    and sophisticated means should not apply in this case.
4        That would be a four-point reduction -- six-point
5    reduction from the 28-point level that is alleged in the PSI.
6    It would then put her at a Level 22, and a Level 22 would be
7    somewhere in the neighborhood of 41 to 51 months.
8        You know, again, if I were to tell you where I think
9    that I am strongest, I think that I am strongest with regards
10   to my points made on sophisticated means and on obstruction of
11   justice.  I am less strong in terms of the foreseeability
12   issue, as to the first argument that I made.
13       If you find that, then, she would be at a Level 24,
14   and the applicable guideline range at a Level 24 would be 51 to
15   63 months, where I would ask you to find that she should be
16   sentenced at the low end, Level 24, 51 months.
17       In looking at the filings of my predecessor in this
18   case, there is a section that he calls "Nonguideline
19   Considerations."  And I don't know how you look at it.  I
20   thought of filing my motion for downward departure under the
21   guidelines.
22       I think that, when you talk about these nonguideline
23   considerations, it's a petition for -- basically, a petition
24   for downward departure, things that have to do with an
25   appropriate sentence, her personal and financial circumstances,

22

1  imposing a sentence that is no longer than necessary to achieve
2  the results of the -- of criminal sentencing.
3          Without going into -- too much into that, the Court
   obviously always has the discretion to fashion a sentence that
5  is appropriate under the circumstances of this case and the
6  circumstances of any case.
7          The Court can consider, obviously, personal --
8          THE COURT: I'd like to wait for the 3553(a) factors,
9  if that's the argument you're going to make.
10         MR. RODRIGUEZ-VARELA: Yes, your Honor. Absolutely.
11 Thank you very much. Then, I have nothing further.
12         THE COURT: Mr. Osborne?
13         MR. RODRIGUEZ-VARELA: I'm sorry, Mr. Osborne.
14 Is there water?
15         THE COURT SECURITY OFFICER: Yes.
16         THE COURT: Yes, Mr. Osborne.
17         MR. OSBORNE: Thank you, your Honor.
18         First of all, with regard to the amount of the loss
19 that the Defendant is responsible for -- or, I guess, really,
20 it's, in the case of a laundering case, the amount of laundered
21 funds that are within the Defendant's relevant conduct.
22         In this case, we charged two checks that were cashed
23 by SND Medical Services, which I think that's the whole
24 dispute.
25         The defense, I understand, agrees that she foresaw --

23

1  reasonably foresaw or knew about all the checks by the other
2  two companies, Falcon Transport and 24-Hour.
3          With regard to SND, we charged two checks. I guess
4  next time I should just charge them all, but maybe then it
5  would seem like overkill.                              exhibit 91
6          Of the two checks we charged, one of them, your
7  Honor, was the check that we had this e-mail where she
8  discussed creating a fake invoice with Ms. Sotto. The other
9  one was just another representative check, just like all the
10 other checks. And the jury convicted her on both counts.
11         So although the defense argument, as I understand it,
12 is basically, since she got convicted of just two checks,
13 that's all that should be included in her relevant conduct,
14 that doesn't really make sense, given that the second check of
15 which she was convicted, the one in Count -- I'm getting the
16 numbers mixed up. That's the one in Count 19.
17         The only thing I thought of afterwards, when I was
18 writing my response to the objections, was the fact that
19 Count 19 charged a check that was cashed after that e-mail was
20 written.
21         I realized that maybe I should have chosen another
22 representative check from an earlier point. You know, we could
23 get the jury's opinion: Did she learn about the laundering at
24 the time of that e-mail or had she already known or whatever?
25         But as I pointed out in my response, even if you

24

1  include in her relevant conduct only the money that was cashed
2  at La Bamba by SND after the date of that e-mail, even then,
3  the relevant conduct would come to slightly more than $400,000.
4          And, anyway, your Honor, as I pointed out, it's not
5  just a question of what did the jury necessarily find in
6  returning their verdict. But, obviously, your Honor heard the
7  evidence for yourself. And I submit the evidence showed that
8  Ms. Duarte knew what was going on.
9          She set up this company, as she admitted. She
10 supposedly thought it was going to do business. But she -- I
11 mean, there's no -- she had no idea of exactly how that was
12 going to work.
13         And she then said, "Well, then" -- you know, she went
14 and opened the La Bamba account, as she admitted. But, again,
15 I submit, on cross-examination, she couldn't provide any
16 reasonable explanation for why she did that.
17         And, yet, with the other company, when she -- she
18 opened bank accounts for her other companies even before they
19 received any money. That's what she said. She thought SND
20 needed a La Bamba account in case they got any money before
21 they'd opened a bank account.
22         I submit her explanations were implausible, your
23 Honor, in addition to which the e-mail itself refers to
24 previous invoices. I'm talking about the e-mail between
25 herself and Ms. Sotto, which was -- I attached it as Exhibit 1

25

1  to my response to the objections to the presentence report. It
2  was also introduced at trial.
3          In that, Ms. Sotto asks her to create this fake
4  invoice and fax the other ones with this one. So she
5  obviously -- I mean, you couldn't write a little four-line
6  e-mail like that if this was the first time that you'd ever
7  been explaining to Ms. Duarte that, "The company is actually
8  doing some business and we'd like you to create some fake
9  invoices."
10         This is obviously not the first time she's ever heard
11 about what SND is doing. Yet, even if this were the first
12 time, as I pointed out, she'd still be responsible for more
13 than $400,000 in loss.
14         So I think that the range selected by the Probation
15 Office, between 400,000 and a million, is clearly the
16 appropriate range in this case, and that is the loss -- or the
17 laundering associated with this Defendant.
18         Now, the next question is whether the laundering
19 involved sophisticated means -- or, I guess, rather, if it's --
20 if it's sophisticated laundering, is the term.
21         Now, first, the defense arguments are focused only on
22 SND. When they say, "Well, it's like a child would have done
23 it," they're talking entirely about the laundering at SND.
24         But the laundering -- if you start with the other
25 companies, it's extremely sophisticated, Falcon Transport and

26

1  24-Hour Network Solutions.  She opened two other shell
2  companies.  She gave them plausible kind of names, like she
3  might be doing some kind of business or services for a clinic.
   In one case, she used a nominee owner.  She did not open it in
   her own name.
6       She then, in some cases, withdrew the money in cash.
7  In other cases, she recruited people to cash checks for her and
8  wrote checks to those people, including notations on the check
9  that would provide a plausible explanation for why the checks
10  had been written, things like commissions and things like that,
11  all of which was fake.
12      And in some cases, she wrote checks to other
13  companies, which she claimed in her testimony that that was
14  just at Ms. Sotto's direction.  But even if that's true -- and
15  I submit her testimony obviously wasn't credible to the jury.
16      But even if it were true that those other companies
17  to whom she wrote checks -- La Casa la Tina, I think, was the
18  biggest one -- even if that's true -- actually, I think that
19  may have been the only other company.  I think there were also
20  other individuals.
21      But even if it's true that those other ones were
22  Ms. Sotto's idea, still, she's writing checks to other
23  companies, other people, disguising the way the bank records
24  look.
25      I think it's actually telling when defense counsel

27

1  said that he's -- there's some cases where the laundering is so
2  sophisticated, involves so many layers, that at the end the FBI
3  has to say, "We can't decide whether the person who handled the
4  checks knew that the money came from an unlawful source."
5       But if that were the standard, sophisticated
6  laundering would only be when people were acquitted.  It's only
7  if it's sophisticated enough that you get away with it.  But
8  that's not the standard.
9       The guidelines specify, your Honor, that
10  sophisticated laundering typically involves the use of.... And
11  they list several possibilities:  Fictitious entities, shell
12  corporations, two or more layers of transactions or offshore
13  financial accounts.
14      There's no offshore accounts here, but there
15  certainly are shell corporations, three of them.  There
16  certainly are levels or layers of transactions, in other words,
17  getting the money to one corporation, writing it to other
18  people or other corporations and then taking it out and
19  returning it in cash.  There's also the use of Mr. Falcon as a
20  nominee owner.
21      Even SND -- actually, I have to disagree.  I'm not
22  sure it is such a childlike way to launder money.  Actually,
23  SND turned out to be their best laundering, your Honor.  Right?
24  They didn't have a bank account.  So we can't say whose
25  signature is on the account.

28

1       Ms. Duarte opened the company, but later she could
2  say she didn't know what it was going to do.  And they took
3  down the money to La Bamba.  There they got a little lucky.
4  La Bamba turned out to be so corrupt that we weren't able to
5  use its records at trial.  They'd already been convicted of
6  filing false currency transaction reports.
7       But, nevertheless, I don't think it was that bad a
8  scheme.  It actually worked pretty well.
9       But, anyway, you have to look at the whole
10  laundering, all three companies, not just the first one.  And
11  the other two were classic sophisticated laundering.  Even the
12  use of three different companies.
13      THE COURT:  What are the three companies?
14      MR. OSBORNE:  SND, Falcon Transport and 24-Hour
15  Network Solutions, your Honor.
16      Falcon Transport was the company that Mr. Falcon
17  acted as the straw owner of and where Ms. Duarte recruited her
18  friends from work to cash checks for her.
19      In 24-Hour Network Solutions, in addition to money
20  from Project New Hope, she deposited what may have been what
21  she says was her paychecks from the other billing company where
22  she worked and mixed the money in and then used some of it for
23  the personal expenses.
24      So I submit that it was sophisticated -- that the
25  laundering was sophisticated and that that enhancement is

29

1  appropriate.
2       Finally, there's the question of whether Ms. Duarte
3  obstructed justice, your Honor.
4       Now, Ms. Duarte obstructed justice on two occasions.
5  The first was in front of Judge Altonaga at the motion for new
6  trial in Ms. Sotto's case, and then the second was in front of
7  your Honor at trial here.
8       Let me start with the one you saw, which was when
9  Ms. Duarte testified here.
10      Now, you know, the defense, I guess, is kind of that
11  it was a bad idea for her to take the stand, that her testimony
12  hurt her, she got bad advice, she shouldn't have taken the
13  stand; and, so, it's not obstruction of justice.
14      It's still obstruction of justice if she took the
15  stand and perjured herself.  That's what the obstruction of
16  justice is.
17      And there's no question, as I point out in multiple
18  instances in my response to the objections, your Honor, that
19  Ms. Duarte perjured herself.
20      In the first place, even just narrowly focusing on
21  the question of whether Ms. Duarte admitted guilt in the sense
22  of admitting that she closed her eyes or that she was
23  deliberately ignorant, it's just not the case that she admitted
24  that.
25      I certainly agree -- I got up in my closing and I

30

1    said to the jury her testimony was false, it was not
2    believable, it helped the Government. I agree her testimony
3    helped the Government in that sense, but that's not the same
4    thing as to say that she actively admitted her guilt.
5         For one thing, let's separate out her direct
6    examination from her cross-examination, because it was on
7    cross-examination, your Honor, that, at some points, she came
8    close to agreeing that she had done some things that, I guess,
9    at least arguably, could be deliberate ignorance, for example,
10   when she used the phrase that she closed her eyes.
11        But she then explained she didn't mean that she
12   closed her eyes to any suspicious circumstances. What she
13   meant was she closed her eyes to the details of how the company
14   was going to be run, that they didn't concern her.
15        So that phrase -- that was a little slip of hers that
16   I'm sure didn't help her when the jury was deliberating. But
17   it's not the same thing as admitting her guilt. On the
18   contrary, Mr. Norris in closing arguments argued that she had
19   not admitted her guilt.
20        I certainly didn't suggest to the jury, "Well, if you
21   even take her own word for it, she'd be guilty. On the
22   contrary, I argued strenuously that her testimony had been
23   false. And it was false, your Honor.
24        There are numerous examples which I cite -- or refer
25   to and discuss in my pleading where she testified falsely.

31

1         First, I point out that her explanation for why she
2    opened an account at La Bamba on behalf of SND, namely, her
3    idea that this was a normal way of doing business in order to
4    get -- in order, when she got her first payment, she could cash
5    it at La Bamba before -- if she didn't have a bank account yet,
6    that that didn't make any sense, that that is not a credible
7    explanation for why she would open a La Bamba account.
8         And, indeed, at Falcon Transport and 24-Hour, she did
9    open a bank account and deposit checks in it. She opened the
10   account with her first check.        FAULTY MEMORY
11        She also -- I pointed out, when she was asked whether
12   she had been present when Ms. Sotto had asked Mr. Falcon to
13   open Falcon Transport, her answer was evasive. She could not
14   clearly state whether she had been present or not or what had
15   happened.       IRRELEVANT
16        That's in contrast, actually, to her earlier
17   testimony in front of Judge Altonaga, where she claimed she had
18   been present for that event.
19        Again, you heard her testimony, your Honor. I mean,
20   when I say it was evasive, I just -- I have to rely on your
21   memory whether you agree with me or not that she was evasive on
22   that point.
23        I also actually pointed out she claimed that she'd
24   been reprimanded at every job she'd ever had for responding to
25   e-mails without reading them, but she couldn't name any

32

1    supervisors at any recent jobs, anybody that we might have been
2    able to find.
3         I pointed out that she claimed that she believed
4    Ms. Sotto that Ms. Sotto intended Francisco Falcon to open up
5    Falcon Transport as a legitimate business, that she believed
6    that he intended. -- this man -- to open up a business and
7    transport patients, although he was unemployed, had no van and
8    had no experience in that area. He was a maintenance man.
9         She also testified, your Honor, that she told
10   Mr. Falcon about the money that Project New Hope had paid
11   Falcon Transport. That testimony was directly contradicted,
12   your Honor, by Mr. Falcon's own testimony. He testified she
13   never told him anything about it and he never heard anything
14   about any money going into that account.
15        Again, I have to rely on your Honor. I submit
16   Mr. Falcon was more credible, that he was the more credible
17   witness and that she was not telling the truth.
18        But most important, your Honor, Ms. Duarte testified
19   that she did not create a false invoice for SND in response to
20   this e-mail, the e-mail that is Exhibit 1 to my objections to
21   the presentence report, that she didn't read the e-mail and
22   didn't understand what she was responding to when she asked if
23   Ms. Sotto still wanted her to fax them.
24        And I submit to you that the jury obviously rejected
25   that testimony in convicting her of the check that corresponds

33

1    to that e-mail and rightly so. The e-mail asks her to create
2    an invoice for M&C for $40,000, M&C Health Center, that is. It
3    doesn't say, "Well, what type of equipment should go on that
4    invoice?" It doesn't refer to any previous orders. It just
5    said, "Date it today and make it for $40,000."       faulty memory
6         That's exactly what Ms. Duarte did, because the FBI
7    found the invoice. They went and searched M&C Health Center
8    and, sure enough, there was an invoice there for $40,000 with a
9    list of medical equipment on it, all made up because SND didn't
10   sell any medical equipment. It didn't even have a bank account
11   to buy any medical equipment.
12        So the jury properly found that Ms. Duarte was not
13   telling the truth, that she was perjuring herself, your Honor.
14        For all of those points I just described, those are
15   all material points and they're all points where she testified
16   falsely. Nobody made her testify falsely.
17        If Mr. Norris gave her bad advice -- you know, they
18   were already hinting that he was ineffective -- we'll see.
19   Before he requested that instruction, your Honor, I talked to
20   him. He told me he'd talked to his client. He had a reason.
21        You asked him that question. You asked Ms. Duarte if
22   she was comfortable. You know, obviously, there's a mechanism
23   for bringing claims of ineffective assistance of counsel, but
24   it's not at sentencing when former counsel isn't present.
25        The point is, once she took the stand, it was easy

34

1  for her to understand what she was supposed to do.  Maybe the
2  tactical decisions involved were complicated, but the -- once
3  she made the decision to take the stand, what she was supposed
4  to do from there was simple:  Tell the truth.
5       It didn't involve -- it didn't require a great lawyer
6  to explain that to her.  It didn't require anybody.  She swore
7  an oath to tell the truth and she didn't do it.
8            Now, your Honor, there was also a second instance of
9  obstruction of justice.  Defense counsel argued that the Court
10 is in the best position to assess the credibility of the
11 witnesses.
12      If that's so, your Honor, I would point out that
13 Judge Altonaga did hear Ms. Duarte testify and found in her
14 order that Ms. Duarte had not testified credibly.
15      I brought with me, your Honor, a copy of the
16 transcript and Judge Altonaga's order.
17      I know that the Court can just take judicial notice
18 of the proceedings in other cases, but I really didn't know if
19 that would create the best record.
20      So what I'd like to do is offer the transcript and
21 the order, which I referred to in my objections to the
22 presentence report, as exhibits now.
23      I marked them Exhibit S-1 for the transcript.  That
24 is Ms. Duarte's September 12th, 2008, testimony, in Ms. Sotto's
25 trial -- new trial hearing.  And S-2 is Judge Altonaga's order,

35

1  where she found that she -- Ms. Duarte was singularly
2  unpersuasive in her testimony.
3       THE COURT:  Any objection?
4       MR. RODRIGUEZ-VARELA:  I would object.  I think I
5  have -- I voiced my objection before.  I mean, it's a different
6  proceeding.  It's not obstruction of justice in her case.
7       Now, the Government decided that was false
8  testimony, they could have charged her with a separate crime
9  over there.  *  Good
10      But to use it here for purposes of trying to convince
11 the Court that she obstructed justice, it certainly has no --
12 shouldn't -- should not be a matter to be considered in this
13 particular case.
14      I don't think it's -- it has to do with this case --
15      THE COURT:  Do you have --
16      MR. RODRIGUEZ-VARELA:  -- if you find it to be -- you
17 know, that she testified unpersuasively.
18      THE COURT:  Do you have authority for introducing
19 that into the record in this case?
20      MR. OSBORNE:  Well, your Honor, that particular
21 argument, which was not made in the objections to the -- in the
22 reply -- Mr. Norris's reply to my response to his objections --
23 in response to that argument, I rely on the guidelines
24 3C1.1, Application Note 4-B, which is giving examples --
25      MR. RODRIGUEZ-VARELA:  One second, please.  I'm

36

1  sorry.
2       MR. OSBORNE:  Sure.  Of course.
3       MR. RODRIGUEZ-VARELA:  3C1.1?
4       MR. OSBORNE:  3C1.1, the commentary.
5       MR. RODRIGUEZ-VARELA:  Which application note?
6       MR. OSBORNE:  Application Note 4-B.
7       MR. RODRIGUEZ-VARELA:  Okay.  Thank you.
8       MR. OSBORNE:  Note 4 is examples of covered conduct,
9  examples of types of conduct to which this adjustment applies.
10      And it states in 4-B as one of those examples,
11 "Committing, suborning or attempting to suborn perjury,
12 including during the course of a civil proceeding, if such
13 perjury pertains to conduct that forms the basis of the offense
14 of conviction."   3C1.1
15      In addition, the text of the adjustment itself
16 doesn't refer only to obstruction of justice in the Defendant's
17 own case, but it says the adjustment is appropriate if the
18 Defendant obstructed justice with respect to the investigation,
19 prosecution or sentencing of the instant offense.
20      So what the Defendant did -- and, again, if it can
21 include civil proceedings where the perjury pertains to the
22 conduct, then surely it can include other criminal proceedings
23 where the testimony pertains to the conduct.
24      The Defendant certainly knew that the Government was
25 investigating her activities because she'd been interviewed in

37

1  2006 about them.  Ms. Sotto had been convicted already by a
2  jury of laundering money for the same thing that Ms. Duarte
3  did.  And she showed up and was asked questions about this same
4  conduct that she was charged with shortly afterwards.
5       THE COURT:  And her testimony was about what?
6       MR. OSBORNE:  Her testimony, your Honor, was really
7  about the same thing that she testified to at trial.  Ms. Sotto
8  was arguing that she, Ms. Sotto, had not known that the money
9  was proceeds of any crime and that she, Ms. Sotto -- if she had
10 been given the report of the interview that I conducted of
11 Ms. Duarte in 2006, that she would have called Ms. Duarte as a
12 witness at her trial -- at Ms. Sotto's trial, that is -- and,
13 therefore, that by not turning over that report, that I had
14 violated Brady.   REASON FOR INDICTMENT
15      And so Ms. Duarte came and testified about the
16 transactions that were not -- not about SND, your Honor,
17 because we didn't charge Ms. Sotto with anything to do with SND
18 or Research Center of Florida, and we didn't know anything
19 about it at the time we indicted her.
20      But Ms. Sotto was convicted just of laundering money
21 through Falcon Transport and through -- well, she was convicted
22 of several different companies.  But Falcon Transport and
23 24-Hour Network Solutions were the only ones that were also
24 involved in this case.  And then Ms. Sotto was also convicted
25 of laundering money through two other companies not involved

38

1  here.

2       THE COURT: I'm going to deny the admission of it

3  into the record here, based upon the language of 3C1.1, which

4  is that if the Defendant willfully obstructed or impeded or

5  attempted to obstruct or impede the administration of justice

6  with respect to the investigation, prosecution or sentencing of

7  the instant offense of conviction.                    *DENIED D.A.J.'S*

8       So I find that language -- I understand what the

9  application note states as far as the civil proceeding. But

10 that might be a civil proceeding that relates directly to the

11 offense of conviction.

12      So I'm going to read it narrowly, as I find I should

13 read it narrowly, and that it would have to relate to the

14 investigation, prosecution or sentencing of the instant offense

15 of conviction, meaning the indictment that was filed against

16 her in the case before me.

17      But I will consider her testimony on the stand in the

18 case before me.

19      MR. OSBORNE: Very well, your Honor.

20      THE COURT: If you want to have it marked for

21 appellate purposes as an exhibit, that -- I have not reviewed

22 neither the transcript of the testimony by Ms. Duarte before

23 Judge Altonaga, nor have I seen the order.

24      MR. OSBORNE: Very well, your Honor.

25      I think that covers, then, all of the objections that

39

1  the defense raised, your Honor. I believe your Honor should

2  deny all of those objections and calculate the guidelines as

3  specified in the presentence report.

4       I also made a motion, your Honor, for an upward

5  departure. I don't know if your Honor wants me to address that

6  now.

7       THE COURT: Let's wait for that until I adopt the

8  report. And then Mr. Rodriguez can make his 3553(a) arguments

9  and you can make your motion for upward departure.

10      MR. OSBORNE: Thank you, your Honor.

11      THE COURT: Anything further, Mr. Rodriguez?

12      MR. RODRIGUEZ-VARELA: Your Honor, just one small

13 detail.

14      You know, I'm clearly not trying to, you know, ask

15 the Court to make any findings as to ineffective assistance of

16 counsel at this point. I know that that is a separate

17 procedure, and I'm not trying to address that now.

18      What I am suggesting to the Court -- and I guess

19 maybe I didn't know how to articulate it earlier -- is it's

20 difficult to make a finding of perjury with regards to the

21 statements made by a defendant from the stand when the jury has

22 considered not just the evidence that the Government has

23 provided, but also the idea and the testimony that admittedly

24 has helped the Government in terms of the Defendant getting on

25 the stand and basically admitting to looking the other way.

40

1       It's hard to say whether the jury convicted her

2  because of that that the Government has brought forward or

3  because of her own admission that she looked the other way and

4  in conjunction with the instruction that was given as to

5  deliberate ignorance.        *VERDICT BASIS*

6       So while, in many cases, it may be easier to make

7  that decision, that assessment, in this particular case, we

8  don't know which -- whether what the client said when she took

9  the stand and the instruction that was given carried the day

10 for the Government or whether the Government in their case in

11 chief without the testimony of the Defendant would have carried

12 the day.

13      So with that in mind, I'll leave it there.

14      Obviously, you know, the Defendant was nervous when

15 she testified. I think that, you know, it's not easy to get up

16 there and testify. It's hard to hold up to a masterful

17 cross-examination, a very, very competent cross-examination, as

18 I told Mr. Osborne.

19      I felt it had been -- I thought it would be -- the

20 Defendant clearly, at her level of sophistication -- I don't

21 think she would have been able to hold up to that, particularly

22 with the idea of willful ignorance and the instruction that was

23 given.

24      Judge, could I have a moment to speak with the

25 family?

41

1       THE COURT: Sure.

2       MR. RODRIGUEZ-VARELA: Thanks.

3       (Discussion had off the record between counsel and

4  the courtroom spectators.)

5       THE COURT: Mr. Rodriguez.

6       MR. RODRIGUEZ-VARELA: Your Honor, thank you.

7       THE COURT: I'm going to deny the Defendant's

8  objections.

9       In regard to the first objection, which is the amount

10 of funds that she should be held accountable for -- in

11 Paragraph 62, under 2S1.1(a)(2) of the guidelines and the

12 corresponding table and 2B1.1, I find that the probation

13 officer's estimation that the value of the funds was more than

14 $400,000, but not more than a million dollars, is correct; and,

15 therefore, the base offense level is 22 under 2B1.1(b)(1)(H).

16      And I base this ruling upon two separate lines of

17 findings:

18      First of all, as to her direct involvement, after the

19 e-mail, which is Exhibit 1 to the Government's response and was

20 an exhibit received in evidence at the trial -- and this is the

21 e-mail from Diana Sotto to Scarlet Duarte on August 13th in

22 which Diana Sotto states to Scarlet Duarte, "Please make an

23 invoice" -- and this is in quotes -- "Please make an invoice

24 for M&C Health Center dated today for $40,000 even.... They

25 will be arriving here in an hour. So if you want to fax me the

42

1  other ones with this one, that would be cool.

2        "D, when you are ready, call me on the cell so I can

3  stand by the fax machine" and then Scarlet Duarte responds -- I

4  believe it was several hours later -- "Do you still want me to

5  fax them or just take them with me?"

6        And a false invoice is created for M&C and then

7  processed through -- it was cashed through SND.  Correct?  The

8  M&C invoices involved checks cashed through SND?

9        MR. OSBORNE:  There was an invoice for $40,000 dated

10  August 13, 2004, your Honor, and there was also a check.  It

11  was Check 1068 from M&C's bank account written to SND Medical

12  Services for $40,000.

13        THE COURT:  And the 40,000-dollar check written to

14  SND on the M&C account was fraudulent Medicare monies being

15  laundered through SND.

16        So subsequent to the e-mail, as the prosecutor

17  indicated, the checks cashed after the e-mail for SND totaled a

18  little over 400,000.

19        In addition, the Defendant opened the La Bamba

20  account, and I believe she testified that she opened it so they

21  could cash checks when they didn't have a bank account or in

22  advance of opening the bank account.

23        The true intent and purpose of opening this La Bamba

24  account was to launder their monies through the cashing of SND

25  checks through La Bamba.  And there were many checks that were

43

1  processed through this account.  For M&C Health Center, Duarte

2  used SND Medical Services to launder $164,769.50.

3        And in Paragraph 44 of the revised advisory

4  presentence investigation report, the last sentence says,

5  "Duarte laundered $348,033.33 for Research Center of Florida

6  using SND Medical Services."  *Diana to testify?*

7        So SND Medical Services was utilized to cash checks,

8  to launder checks from many corporations.  And La Bamba Check

9  Cashing, where they had, quote-unquote, an account was utilized

10  to cash the checks.

11        So on that direct involvement theory, I find that she

12  should be held accountable -- that it was reasonably

13  foreseeable for her to be held accountable for all of the

14  checks cashed through SND.

15        Turning now to 1B1.3, relevant conduct, (a), which

16  indicates that the base offense level shall be determined on

17  the basis of the following:

18        1B:  "In the case of a jointly undertaken criminal

19  activity, a criminal plan, scheme, endeavor or enterprise

20  undertaken by the Defendant in concert with others, whether or

21  not charged as a conspiracy, all reasonably foreseeable acts

22  and omissions of others in furtherance of the jointly

23  undertaken criminal activity."

24        And Application Note 2 under 1B1.3 states, "A jointly

25  undertaken criminal activity is a criminal plan, scheme,

44

1  endeavor or enterprise undertaken by the Defendant in concert

2  with others, whether or not charged as a conspiracy.

3        "In the case of a jointly undertaken criminal

4  activity, Section (a)(1)(B) provides that a defendant is

5  accountable for the conduct, acts and omissions of others that

6  was both in furtherance of the jointly undertaken criminal

7  activity and" -- that's one -- "and, two, reasonably

8  foreseeable in connection with that criminal activity.

9        "In order to determine the Defendant's accountability

10  for the conduct of others under Subsection (a)(1)(B), the Court

11  must first determine the scope of the criminal activity the

12  particular Defendant agreed to jointly undertake, that is, the

13  scope of the specific conduct and objective embraced by the

14  Defendant's agreement."

15        And here, the Defendant was charged in Count 17 with

16  conspiracy to commit money laundering with Miguel Libera,

17  Rechart Garcia and others known and unknown to the grand jury,

18  to conduct financial transactions which involved the proceeds

19  of a specified unlawful activity, healthcare fraud, knowing

20  that the property involved in the financial transaction

21  represented the proceeds of some form of unlawful activity and

22  knowing that the transaction was designed, in whole and in

23  part, to conceal and disguise the nature, the location, the

24  source, the ownership and the control of the proceeds of the

25  specified unlawful activity, in violation of Title 18,

45

1  Section 1956(a)(1)(B)(1).

2        So here, I find that the scope of the criminal

3  activity that Scarlet Duarte agreed to jointly undertake was

4  the creation and operation of various corporations, shell

5  corporations, corporations by nominee owners and businesses to

6  conceal and disguise the healthcare fraud and the proceeds from

7  healthcare fraud being conducted by Diana Sotto and Miguel

8  Libera, Rechart Garcia and others.

9        "The conduct of others that was both in furtherance

10  of and reasonably foreseeable in connection" -- I'm reading

11  now.  Strike that.

12        Going back to Application Note 2 of 1B1.3, "The

13  conduct of others that was both in furtherance of and

14  reasonably foreseeable in connection with the criminal activity

15  jointly undertaken by the Defendant is relevant conduct under

16  this provision."

17        So here, I find that the Defendant should be held

18  responsible for the conduct of other persons involved in the

19  conspiracy to cash checks and receive proceeds of healthcare

20  fraud and to conceal the nature and to disguise the nature of

21  that criminal activity.

22        And that is demonstrated by the creation of these

23  various accounts, the creation of corporations, the opening of

24  the SND account at La Bamba, which was for the sole purpose of

25  cashing checks that were the proceeds of Medicare fraud.

46

1    Therefore, she should be held accountable for the

2  conduct not only of herself, but other persons, as it was

3  reasonably foreseeable to her and it was reasonably foreseeable

4  in connection with the criminal activity that was jointly

5  undertaken by the Defendant and the other persons charged in

6  the indictment as well as Diana Sotto and others known and

7  unknown.

8    It was reasonably foreseeable to this Defendant, to

9  Scarlet Duarte, that the account at La Bamba would be utilized

10 not only for the checks that she was directly involved in, but

11 for other checks through SND to be cashed as laundering the

12 proceeds and concealing the proceeds of Medicare fraud.

13    It was reasonably foreseeable to Scarlet Duarte that

14 the other corporations, including Falcon Transport, 24-Hour

15 and MD Billing, would be utilized for the concealment and

16 distribution of proceeds of Medicare fraud by both herself and

17 by the other persons involved in the conspiracy, including

18 those charged in Count 17, Diana Sotto and others known and

19 unknown to the grand jury.

20    So I find that the base offense level of 22 is the

21 correct base offense level, based upon the amount and value of

22 the funds that the probation officer found was attributable to

23 this Defendant, including the $54,000 in Counts 19 and 20.

24    I'm also going to deny the objection as to the

25 two-level increase for 2S1.1(b)(3), sophisticated money

47

1  laundering, in Paragraph 64.

2    Based upon the evidence introduced at trial, this

3  Defendant, Scarlet Duarte, utilized three shell corporations --

4  SND Corporation, Falcon and 24-Hour Network Solutions -- to

5  accomplish money laundering and conceal and disguise the nature

6  of Medicare fraud proceeds.  ✳

7    She also used a nominee owner in the setup and

8  creation of Falcon Transport, a corporation that she and Diana

9  Sotto created and put her stepfather in as the nominee owner so

10 that he could provide transportation for Medicare patients,

11 something that never happened. This was never an operational

12 corporation.

13    She wrote checks on the SND account to third parties

14 who were totally unrelated to this operation and had those

15 persons cash the checks to disguise and conceal the Medicare

16 fraud monies that were being delivered to various fraudulent

17 clinics so that it would not be discoverable and that the

18 proceeds could be distributed.

19    In addition, there was at least a check written to

20 one other company.

21    So based upon that and the application note of 2S1.1,

22 which clearly states that sophisticated laundering typically

23 involves the use of fictitious entities, shell corporations and

24 two or more levels, that is, layering of transactions,

25 transportation, transfers or transmissions involving criminally

48

1  derived funds that were intended to appear legitimate.

2    And that's exactly what happened here. There were

3  fictitious entities. There were shell corporations. There

4  were nominee owners. And there was layering of transactions,

5  monies being transferred from the fraudulent clinics to SND and

6  24-Hour Network and other corporations.

7    And then, at least in the case of SND, then checks

8  were written to third parties who were totally not involved in

9  this operation, and the evidence was that they were approached

10 and asked if they would go and cash a check, which they did.

11    And so, therefore, this clearly and squarely falls

12 within the sophisticated laundering under 2S1.1(b)(3).

13    I also find that, based upon the Defendant's

14 testimony at this trial, that there should be a two-level

15 increase for obstruction of justice under 3C1.1, as indicated

16 in Paragraph 67.

17    This Defendant chose to take the stand and testified

18 falsely concerning the fact that she didn't read the e-mail.

19 She stated on the stand -- which is Exhibit 1 attached to the

20 Government's response, and that's the e-mail regarding the

21 preparation of a false invoice for M&C.

22    She then went on to say that very often she's been

23 reprimanded in her various jobs because she didn't read the

24 e-mail.

25    Well, the e-mail itself clearly indicates that she

49

1  read the e-mail and that she was testifying falsely about it. ✳

2    She testified falsely about the reason for opening

3  the La Bamba account, to cash checks, and indicated that this

4  was sort of a temporary situation until they would get a bank

5  account for SND. That was not true.

6    The reason for the opening of the account at La Bamba

7  was so that Medicare fraud checks could be laundered and

8  concealed and cashed and the proceeds of Medicare fraud

9  distributed without being able to trace it.

10    She testified falsely about the reason for setting up

11 the Falcon Transport corporation and what she knew about the

12 opening of the Falcon Transport corporation, the setup of it

13 involving her stepfather, what he knew, what she knew, what it

14 was all about. She testified falsely about that as well. To the Grand

15    She testified that she didn't really know and wasn't   Jury

16 present when Diana Sotto asked her stepfather, Mr. Falcon, to

17 open Falcon Transport. She testified that she was under the

18 understanding that this was a legitimate patient transport

19 business, when it was quite clear that this was not for the

20 purpose of transporting patients.

21    She testified falsely about her knowledge about the

22 various monies that were deposited into the Falcon Transport

23 accounts, including a 75,000-dollar investment from Project New

24 Hope.

25    Basically, this Defendant, when she testified,

50

1  attempted to rewrite history as to her knowledge and

2  involvement in this large-scale money laundering conspiracy,

3  indicating that she was uninvolved.

4      I find that she testified falsely throughout her

5  testimony, including those areas that I specifically

6  referenced.

7      So on that basis, I will deny all of the objections

8  and I will adopt the factual findings and guideline

9  applications as contained in the revised advisory presentence

10  investigation report.

11      Before going further, I would ask counsel to review

12  with me the major calculations in the revised advisory

13  presentence investigation report.

14      Let me just make -- before I go through that with

15  you, I specifically find that this sentencing hearing

16  concerning the conviction of Scarlet Duarte of the superseding

17  indictment is not the appropriate forum for there to be any

18  determination of the effectiveness or ineffectiveness of her

19  counsel, though I will note for the record, as I recall, that I

20  colloquied the Defendant both before she testified as to a

21  waiver of her Fifth Amendment rights and whether she was

22  satisfied with her attorney and I colloquied her prior to and

23  at the time that her lawyer requested the deliberate ignorance

24  instruction and whether that was her decision and whether she

25  was satisfied with her lawyer.

51

1      But that's for another proceeding.

2      And I only bring it up because counsel for the

3  Defendant brought it up at this hearing.

4      So let's review the calculations in the revised

5  advisory presentence investigation report.

6      The offense level is 28; the criminal history

7  category is Roman numeral I; the advisory guideline range is

8  78 to 97 months' incarceration, two to three years' supervised

9  release, a potential fine of $12,500 to $3,941,346; and $100

10  special assessment as to each count of conviction, for a total

11  of $600.

12      Is that correct in its totality?

13      MR. OSBORNE: Yes, your Honor.

14      MR. RODRIGUEZ-VARELA: Yes, Judge.

15      THE COURT: Ms. Duarte, you're in court today to

16  receive your sentence. Before that happens, I must ask you if

17  there's any legal cause as to why the sentence of the law

18  should not be pronounced upon you.

19      THE DEFENDANT: No.

20      THE COURT: No legal cause having been shown as to

21  why sentence should not be imposed, the Court will consider

22  whatever you may wish to say in mitigation.

23      Mr. Rodriguez?

24      MR. RODRIGUEZ-VARELA: Thank you very much, your

25  Honor.

52

1      It's a tough position, obviously, to be here in a

2  situation such as this. I see the Court knows the case very

3  well.

4      I don't know that -- and it was the opinion of at

5  least one of the witnesses who testified that Scarlet was used

6  for this. Whether she was willing to admit it on the stand,

7  whether she was willing to admit it by way of plea or whatever

8  is another thing.

9      But that she is somehow less culpable than

10  Ms. Sotto -- I think that's -- I think that that -- that would

11  be an appropriate thing to say.

12      To say that Ms. Sotto was in the driver's seat in

13  terms of the conspiracies to commit healthcare fraud, in terms

14  of the billing that was being done, that she was the mastermind

15  of that, I think that's probably appropriate, together with her

16  friends and her associates who were the various owners of the

17  different companies.

18      When we view this, it's not just a money laundering

19  conspiracy. This is a healthcare fraud conspiracy that has an

20  element of money laundering.

21      Research Center of Florida, M&C Health Center,

22  Project New Hope, LR Medical Center, L&B Health Center, RL&V

23  Medical Service bilked the Medicare system of millions and

24  millions of dollars, which is a horrible, horrible thing. I

25  don't think that anybody can deny that, that it's a horrible

53

1  thing. It's a very serious offense.

2      That's where the -- the main part of the crime, if

3  you will, the more powerful portion of the conspiracy. There

4  would be no money to launder if it hadn't been for them.

5      Then you have certain people that -- because, of

6  course, you know, getting a check or a draft from the Medicare

7  system into your account is one thing. Personally putting your

8  hands on the money is quite another.

9      And the "intelligent" people who do this -- in

10  quotations, "intelligent" -- because they're criminals, but

11  they're still intelligent -- find people like Scarlet, give her

12  a little piece of the action to do the most obviously criminal

13  part of the crime, the people akin to the ones that handle the

14  drugs, the people that internally carry the drugs in here, the

15  people who deliver drugs for major traffickers -- all those

16  people are expendable members of the conspiratorial wheel.

17      If not Scarlet, almost any other willing to sacrifice

18  their freedom, if you will, for a few dollars.

19      When you look at Scarlet's life, Scarlet was a good

20  girl. She went to school, not unlike many other young people

21  who go to school, who try to find themselves a path through

22  life where they honorably make their money and they work hard,

23  contributed to her family, to her mom, to her dad, to her home,

24  worked hard to support the kids.

25      And all through that period of time -- I think junior

54

1  high is where she meets this girl, Ms. Sotto.

2        Now, Ms. Sotto comes from a family that has money.

3  Ms. Sotto has always had money.  Ms. Sotto doesn't have any

   problems, any care in the world.

4        Somehow, she lets herself be preyed upon by Sotto to

5  do this.  Now, why Sotto isn't doing these things herself is

6  obvious.  She's the mastermind of the operation.  Even the

7  people that opened clinics are under the direction of Sotto.

8        The people that are -- that own these clinics, they

9  don't know what they need to bill.  They don't know what are

10  the drugs that Medicare is paying for and the drugs that

11  Medicare is not paying for.

12

13        If you run an HIV clinic, even though the HIV clinic

14  is false, you still need somebody that knows what are the drugs

15  that are billed through an HIV clinic because, if they start

16  billing other drugs, then, obviously, it's not going to make

17  any sense and it's going to be more easily discovered that

18  there's fraud going on there.

19        Now, those are not the duties of somebody like

20  Scarlet Duarte.  Scarlet Duarte's duties are more -- you know,

21  more of the high-risk position, you know, "You cash the checks.

22  You put your face on this.  You open the company.  You do these

23  things."

24        Now, admittedly, that helps the people who are

25  committing the fraud get their hands on the money.  But they're

55

1  the ones that are getting the lion's share of this.

2        It still doesn't detract from the fact that she was,

3  by accounts of people who testified and were, apparently,

4  truthful, used, used to some extent, used because of her lack

5  of intelligence, used because of her financial position, used

6  because of her needs, used because of her children's needs,

7  used because of her family's needs, but used.  That doesn't

8  exculpate her from her responsibility in this case.

9        And based on the Court's rulings and the conviction

10  on the indictments in this case and -- the Court, listening to

11  our objections, has determined that at least the 28 -- the

12  Level 28 is the appropriate level; and then that's it.  I mean,

13  there's no more discussion about that.  We accept that that's

14  the Court's findings, a Level 28, and that's it.

15        But there's certain things that that number doesn't

16  take into account.  That number doesn't take into account what

17  her life has been like before.  Obviously, she has no criminal

18  history.

19        She has always been a producing member of society, a

20  person who has worked, who despite the fact that there was some

21  separation in her family -- her dad and her mom separated --

22  and she had her children, she still maintained herself close to

23  her family.

24        Her family, as you can see, is very supportive.

25  They're all here, if not -- most of them are here today.  Her

56

1  father is here.  Her mother is here.  The kids are here.  It's

2  a testament to the fact that Scarlet made a mistake, a horrible

3  mistake, a huge mistake, that she's going to pay dearly for.

4  But, your Honor, inside, she is a good girl that was corrupted.

5  She didn't start out this way.

6        And I know that you often see people here crying and

7  saying, you know, "Oh, my God.  People made me do this."

8  Nobody made her do anything.  She did things on her own.

9        But the reality is that she is -- she may not qualify

10  under minor role because of how strict minor role is, but if

11  you look at her conduct, clearly, clearly, her conduct is that

12  of a person who is far less culpable than the conduct of Miguel

13  Libera, Miguel Libera, who was called to testify in this case.

14        And I think that the minute he opened his mouth, the

15  prosecutor had to pull the plug because he started saying that

16  he didn't expect that there would be any kind of a reduction or

17  anything with what he's doing.

18        Batista and Hernandez, Capdevila, people who are the

19  ones that are driving the big Mercedes-Benz on the street,

20  Judge, the ones with the 7,000-square-foot homes, the ones with

21  the 60-foot yachts in the most prestigious marinas around

22  town -- you know, we all see those people.

23        And then we see the people that are driving their Kia

24  Sorento and their -- you know, their biggest claim to fame is

25  their new Yukon where they can transport their kids and go eat

57

1  at McDonald's and be able to buy -- instead of the cheap

2  glasses, buy a little bit better glasses.  That is the

3  incentive for somebody like this.

4        It's not to live the grand life, because you're not

5  going to live the grand life with the meager pieces that they

6  throw to you under these conditions.

7        So I ask the Court to consider her personal history,

8  her family history, her employment history, her circumstances

9  as an individual, to consider the fact that she is not by any

10  stretch of the imagination an essential element of this

11  conspiracy.  Because, like I said before, if it wasn't Scarlet,

12  it'd be anybody else.

13        A sentence of 70, 80 months is higher than the

14  sentence that the -- than the fraudsters get in this case.

15  Sure.  They pled guilty.  They agreed to cooperate with the

16  Government.  They're smarter.  They know what they're supposed

17  to do.  So they end up with sentences that are perhaps smaller,

18  more manageable.

19        But a sentence in the 70s and the 80 months for a

20  person like Scarlet is overkill.  Scarlet is unlikely to ever

21  engage in criminal conduct again.  It would be very difficult

22  to even consider how she would not -- not be more careful about

23  the associations that she becomes involved in throughout the

24  rest of her life.

25        She is a person who is not violent, an individual

58

1  that has always done well until now, until she found herself in
2  the bottom-feeder position of this large conspiracy.
3        Sometimes the Government files these cases
4  separately. They put the clinic owners over here and they file
5  that indictment. They put the money launderers here and they
6  do that indictment.
7        But, in reality, it's not two conspiracies. We don't
8  have a money laundering conspiracy and a healthcare fraud
9  conspiracy. This is a healthcare fraud conspiracy that has
10 various components, various components.
11       Scarlet never did get that Rolex. She never did get
12 to drive that, you know, SL 500 convertible. She never did get
13 that house in Cocoplum or Gables By the Sea.
14       She continued to struggle throughout the time she was
15 engaged in this conspiracy. Her accounting records would
16 demonstrate that she never amassed any amounts of money to
17 speak of.
18       The kids continued to go to their regular school.
19 They -- at one point, they got better glasses. They used to go
20 eat at McDonald's more often than they used to before, and that
21 was the outing. The outing was to McDonald's.
22       You know, they didn't take them out on a Disney
23 cruise. They didn't take the kids out to Vail for private ski
24 lessons. That's the stuff of the fraudsters. That's the stuff
25 of the guys up there.

59

1        We've seen them. You've seen them. It's not the
2  stuff of a bottom-feeder like her.
3        So sentence her like a bottom-feeder, Judge. I urge
4  you to look upon her as I look upon people like this
5  oftentimes. I even feel sad for them. It's pitiful to see how
6  people ruin their lives for nothing. And that's what happened
7  here.
8        So in the great amount of discretion that you have
9  where guidelines are advisory and sometimes cruel and sometimes
10 not necessarily fitting of the particular circumstances of
11 these cases that we see here, fashion a sentence, your Honor,
12 that punishes the Defendant, but that recognizes her particular
13 situation and the particular need to be protected from a person
14 like Scarlet Duarte.
15       Had it not been for this situation that was already
16 ongoing, Scarlet Duarte would have continued on through life
17 without committing any kind of crime.
18       And you know what? Maybe she would have gotten that
19 Mercedes. Maybe she would have gotten that big house, you
20 know, with a white picket fence. Who knows? But certainly not
21 FDC Miami.
22       So you know the discretion that you have. I urge you
23 to exercise it and fashion a sentence that is lower than a
24 Level 28 would call for. How much lower? Whatever the Court
25 thinks is appropriate, if you even think it's appropriate.

60

1        But we rely on this Court's sense of justice, and we
2  thank you for your time this afternoon.
3        I know that Scarlet wanted to say some things.
4        THE COURT: Yes.
5        Ms. Duarte, is there something you want to say?
6        MR. RODRIGUEZ-VARELA: Yeah. So we'll go ahead with
7  that.
8        THE COURT: And we have an interpreter available for
9  you, Mr. Rodriguez.
10       MR. RODRIGUEZ-VARELA: Thanks. It's for the mom and
11 for the dad. You know, they don't speak English. I'm sorry
12 about that. I didn't consider that. I apologize.
13       THE COURT: We have an interpreter for you.
14       MR. RODRIGUEZ-VARELA: Thank you so much.
15       Do you want to start with them so the interpreter can
16 go?
17       THE COURT: It's up to you.
18       MR. RODRIGUEZ-VARELA: Sit down.
19       Let's call the mom.
20       Where do you want her? At the lectern?
21       THE COURT: Yes, please.
22       MR. RODRIGUEZ-VARELA: All I want you to do is to --
23       MS. FALCON: Yes. My name is Isabel Falcon.
24       MR. RODRIGUEZ-VARELA: Ma'am, what is your name
25 again, for the record?

61

1        MS. FALCON: Isabel Falcon.
2        MR. RODRIGUEZ-VARELA: Ms. Falcon, how are you
3  related to Scarlet?
4        MS. FALCON: I'm her mother.
5        MR. RODRIGUEZ-VARELA: You and I spoke outside. I
6  told you what, basically -- you know, you wanted to tell the
7  Court some things, and I told you to just -- I would call you
8  and let you just address the Court.
9        Remember that?
10       MS. FALCON: Yes.
11       MR. RODRIGUEZ-VARELA: So now is your time to talk to
12 the Judge about Scarlet, what you think is important for the
13 Judge to know about how she is and what kind of person she's
14 always been and what she means to you and the family.
15       MS. FALCON: For me, she means my entire life. She's
16 more than a daughter to me. She's like my mother, because I
17 have been a person of very low culture, not much culture. I'm
18 rather ignorant.
19       She has taken care of me. She's been mother and
20 father to her own children. I'd like to say that, without her,
21 perhaps my life will be shortened because, for me, she's always
22 been my right hand in every aspect.
23       MR. RODRIGUEZ-VARELA: Are you ill?
24       MS. FALCON: Yes. I have problems. I have diabetes.
25 I have kidney problems, hypoglycemia.

62

1    MR. RODRIGUEZ-VARELA:  While Scarlet was out, did she

2  help you in any way cope with those conditions?

3    MS. FALCON:  She was the one who helped me with my

4  diet. She would be the one to take me to the doctor, help me

5  in every way.

6    MR. RODRIGUEZ-VARELA:  Now, tell the Court, do you

7  also know Diana Sotto?

8    MS. FALCON:  Yes, sir.

9    MR. RODRIGUEZ-VARELA:  How did you know Diana Sotto?

10  How did she come to be known by the family?

11    MS. FALCON:  As a young girl, my daughter used to

12  attend the same school. That's where they met. When they met,

13  Diana had a special interest -- or developed a special interest

14  in my daughter.

15    But when I met her, I noticed what her problems were.

16  Specifically, there was one teacher who called me up to ask me

17  not to allow my daughter to continue her friendship with Diana.

18    MR. RODRIGUEZ-VARELA:  Now, did you advise your

19  daughter against maintaining a friendship with Diana?

20    MS. FALCON:  No. Honestly, what I actually did was

21  to move away so they would not have any further contact.

22    MR. RODRIGUEZ-VARELA:  How would a lengthy sentence

23  that this Court may impose in this particular case affect you

24  and your family?

25    MS. FALCON:  It would be so hard that I'm not able to

63

1  put it into words, honestly.

2    MR. RODRIGUEZ-VARELA:  Do you have anything to tell

3  the Court that is about to sentence her as to something that --

4  you know, one thing she should consider about your daughter

5  that stands out?

6    MS. FALCON:  Yes, sir.

7    MR. RODRIGUEZ-VARELA:  What is that?

8    MS. FALCON:  What I want to make sure that you

9  understand is that, from the very moment that my daughter

10  started back at work with Diana Sotto, my husband was out of

11  work.

12    I taught my daughter to deeply love -- how to deeply

13  love her stepmother as well as her stepfather.

14    MR. RODRIGUEZ-VARELA:  Did she help the family

15  financially during the time that your husband was out of work?

16    MS. FALCON:  No. Forever, always, she has always

17  helped us whenever we needed it. And I've always helped her as

18  well whenever she has needed me.

19    MR. RODRIGUEZ-VARELA:  Anything else you want to tell

20  the Court briefly?

21    MS. FALCON:  It was not my daughter who involved her

22  stepfather in this job. It was I who asked her to find him a

23  job.          OJO

24    MR. RODRIGUEZ-VARELA:  Thank you very much.

25    MS. FALCON:  Thank you.

64

1    MR. RODRIGUEZ-VARELA:  Judge, this is Mr. Duarte.

2  How old are you, kid?

3    MR. DUARTE:  15, sir.

4    MR. RODRIGUEZ-VARELA:  He is -- it's not my

5  preference to have minors address the Court in these matters.

6  He has been very insistent in wanting to address the Court.

7  It's not my preference.

8    THE COURT:  It's up to you, sir.

9  What is your name?

10    MR. DUARTE:  Hiram Anthony Duarte.

11    THE COURT:  Yes, sir.

12    MR. DUARTE:  Your Honor, I'm not here to tell you how

13  to do your job. I don't know if anything -- any of this is

14  real or not. But I know what I feel for my mother is real.

15    My mother's my everything. She has been there

16  through thick and thin. She's helped me. She's always been

17  there. My father never helped. She was my life.

18    And I don't want to look like a joke to you because

19  I'm wearing my high school ROTC uniform. I just want to show

20  you that I am a proper young man and she has raised me to be

21  this proper young man.

22    I am -- I want to show that I represent her in

23  everything she's done for me and I have done great in

24  everything I have done because she has been there to push me.

25    I have many problems in my life right now. My mom

65

1  being away from me, now that I'm an adolescent -- that would be

2  horrible for a lengthy time, ma'am -- your Honor. I'm sorry.

3    Your Honor, I hope you find it in your heart not to

4  give her the most lengthy time there is. But I'm not here to

5  tell you how to do your job.

6    I'm here to show you how I feel about my mother with

7  respect to all my family, that she is single-handedly the

8  greatest person I have ever met in my life. She's amazing.

9    (Defendant crying).

10    MR. DUARTE:  Mom, please don't cry.

11    THE COURT:  Why don't we take a break for a few

12  minutes so the Defendant can compose herself. We'll be in

13  recess for ten minutes.

14    (Thereupon a recess was taken, after which the

15  following proceedings were had:)

16    THE COURT:  You may be seated.

17    We're back on United States of America versus Scarlet

18  Duarte, Case No. 08-20851.

19    Counsel and Probation, state your appearances,

20  please, for the record.

21    MR. OSBORNE:  Good afternoon, your Honor.

22  Marc Osborne again on behalf of the United States.

23    MR. RODRIGUEZ-VARELA:  Nelson Rodriguez-Varela on

24  behalf of the Defendant, Scarlet Duarte, who's present before

25  the Court.

66

1       THE COURT:  Probation, would you state your
2   appearance.
3       THE PROBATION OFFICER:  Good afternoon, your Honor.
4   Michelle Burgess on behalf of Probation.
5       THE COURT:  Yes, Mr. Rodriguez.  You're ready to
6   proceed?
7       MR. RODRIGUEZ-VARELA:  Yes, your Honor.
8       I'm ready to proceed with Ms. Duarte, who has a
9   brief -- if she can just remain seated.
10      THE COURT:  Sure.  That's fine.
11      MR. RODRIGUEZ-VARELA:  Given her situation, I want
12  her just to sit.
13      THE COURT:  That's fine.
14      MR. RODRIGUEZ-VARELA:  She wishes to address the
15  Court.  Thank you, your Honor.
16      THE DEFENDANT:  Your Honor, I am facing the position
17  of a sentence that is -- and that is a much bigger challenge
18  than any other that I have had to endure before, and I must
19  tell you that I have endured a lot.
20      I have been a child that had to overcome many
21  difficult family circumstances, circumstances that carried
22  emotional distress, perhaps many more than any of my age.
23  Therefore, I had to grow up faster.
24      I did not have an ideal childhood, but I still
25  survived.  I got married at a young age and had two beautiful

67

1   children.  I thought that I finally had the stability I needed
2   and wanted desperately, but it did not turn out to be the way
3   that I expected.  *I would not life*
4       I have been able to forgive all the things and people
5   that were not up to my expectations.  I was able to heal my --
6   I have been able to heal my wounds and I have never inflicted
7   any wounds on any of my loved ones, especially my kids.
8       I have always worked very hard for them, and I have
9   been the backbone for both of my boys.
10      I've made some serious mistakes and poor choices, and
11  I hope that you understand that I never wanted to become a
12  Defendant in a court of justice.  I realize now that these
13  wrong choices have taken me far into this trouble.
14      There are many things that I would have done
15  differently if I had the opportunity, but I guess that will not
16  be possible for me now.  I cannot change the past, but I can
17  certainly change the future.
18      I do not see this court as a place of punishment, but
19  as a place of solution.  Where there is a transgression of the
20  law, a cure is needed.  As a responsible adult, I am dealing
21  with this situation honestly and, for the first time in my
22  life, with full knowledge and understanding.
23      I thank all of you, including Assistant US Attorney
24  Marc Osborne and the lead agent, Hui Nguyen, and my family, who
25  have supported me unconditionally, my attorney that has taken

68

1   this case under such unique circumstances, and most of all you,
2   your Honor, expecting that you could render a fair judgment.
3       I embrace the jury verdict, believing in the justice
4   of the United States and believing in your sense of justice and
5   equity.  I submit myself to your mercy and the compassion that
6   my words might have awakened in your heart.
7       I have always treated everyone with respect and
8   compassion and understanding, and I certainly hope and pray
9   that this Court treats me the same way.
10      And I ask finally, but not least, that you do -- if
11  you could find it in your heart not to separate me from my boys
12  for such an extended period of time.
13      That's all.
14      Thank you.
15      THE COURT:  What does the Government say?
16      MR. OSBORNE:  In the first place, your Honor, as I
17  mentioned, the Government is seeking an upward departure in
18  this case.  We're seeking an upward departure as authorized by
19  Sentencing Guidelines 3B1.1, Commentary Note 2.
20      That comment -- and I requested this upward
21  departure, your Honor, in my response to the objections to the
22  presentence report, and it was also noted as a possible basis
23  for upward departure in the presentence report itself.
24      That note indicates that an upward departure may be
25  applicable if the Defendant did not lead -- did not organize,

69

1   lead, manage or supervise another participant, but exercised
2   management responsibility over the property, assets or
3   activities of a criminal organization.
4       I think that's appropriate here, your Honor.  The
5   Defendant recruited multiple people to participate in the
6   crime -- and I use the word "participate" in the ordinary sense
7   of the word now, not the guidelines sense -- but just factually
8   got them involved, her stepfather, her friends at work who
9   cashed checks for her.
10      The Defendant was the sole signatory on two of the --
11  well, her stepfather was a signatory on the Falcon Transport
12  account, but she signed all the checks and she was the sole
13  signatory on the 24-Hour Network Solutions account.  So she was
14  in charge of the bank accounts.
15      And although she claims that everything she did was
16  at Ms. Sotto's direction, in the instances we actually have
17  witnesses to testify to it, they say that it was Ms. Duarte who
18  recruited them to cash the checks, who gave them the checks,
19  that sort of thing.
20      So we can't prove by a preponderance of the evidence
21  that any of those people were participants in this scheme.
22  And, actually, I don't -- I don't actually think they were.
23      But, nevertheless, given the role she played in
24  making it all happen and recruiting these people and directing
25  what they should be doing, then we think that upward departure

70

1 is appropriate, your Honor, and I recommended a two-level
2 upward departure.
3     THE COURT:  Do you have a response to the request for
   an upward departure?
4     MR. RODRIGUEZ-VARELA:  Your Honor, I don't think
5
6 that, under the circumstances, an upward departure in this case
7 is appropriate.  The ends of justice could be met by a sentence
8 that the Court can fashion without regards to any upward
9 departure.
10     So I would object to that.
11     THE COURT:  I'm going to deny the Government's
12 request for an upward departure under 3B1.1 as referenced in
13 Application Note 2.
14     The application note does reference someone who is
15 not an organizer, leader or manager, supervise another
16 participant, which is required for an increase in the levels
17 under 3B1.1.
18     The application note goes on to say, "but who,
19 nevertheless, exercised management responsibility over the
20 property, assets or activities of a criminal organization."
21     First of all, I recognize that I have the discretion
22 to upwardly depart.  I find it's a close call as to whether,
23 under the facts and circumstances of this case, this Defendant
24 exercised management responsibility over the property, assets
25 or activities of a criminal organization.

71

1     She was certainly a full and willing participant.
2 I'm just not convinced that the underlying facts of this case
3 are indicative of management responsibility and, if there was
4 management responsibility, that it is of such an extent that I
5 would find that an upward departure is warranted, though I do
6 find it's a close call.
7     But I don't find that it's warranted.  I think that,
8 in looking at the other sentences in this case and the 3553(a)
9 factors as well, that I don't find it would be warranted or
10 appropriate in this case, based upon the underlying facts.
11     If you would, stand with your client, please.
12     In a few weeks, I will have been on the federal bench
13 for 14 years.  In these 14 years, I've sentenced on the average
14 of about two or three people a day, 50 weeks a year, for
15 14 years.
16     It is the hardest part of my job.  It's always very
17 difficult because it is always very sad.  There are many, many
18 victims involved in all of the defendants that I sentence, and
19 this case is no exception.
20     Ms. Duarte, in your statement to me, you indicated
   that you felt that you had not wounded any members of your
22 family, especially your children.  I think you're going to have
23 to think about that statement --
24     THE DEFENDANT:  May I --
25     THE COURT:  -- because -- yes, ma'am.

72

1     THE DEFENDANT:  What I meant to say was I have never
2 wounded.  I had never wounded.  Maybe I read it incorrectly.
3 But I had never wounded.
4     MR. RODRIGUEZ-VARELA:  You mean before?
5     THE DEFENDANT:  Right.  I had never wounded --
6     THE COURT:  Before this time?
7     THE DEFENDANT:  Right.  Right.  I had never
8 wounded --
9     THE COURT:  Because I think that your children are
10 very wounded by this.
11     THE DEFENDANT:  Definitely.  I agree with you.
12     THE COURT:  The fact that they are not going to know
13 their mother's touch or guidance for a period of time during
14 very impressionable years -- and it seems that there's not,
15 from what your son said, a tremendous amount of influence from
16 their father in their lives.
17     It is indeed very sad.  And I thought that your son
18 spoke, as I'm sure you did -- that he spoke beautifully.  He
19 spoke from the heart.  It's not easy for a 15-year-old to get
20 up and say, "I've got problems and I'm trying to deal with
21 them" and how much my mom means to me under these
22 circumstances.
23     I always find it extremely sad that the persons who
24 come before me -- and this Defendant is no exception -- only
25 begin to realize what is so important in their lives when they

73

1 have hit this rock bottom.  One would have hoped that a single
2 mom trying to provide a good home for her children might have
3 said, "I'm not going to be involved in this because my children
4 are so much more important to me than obtaining money in this
5 fraudulent way and being part of this."
6     And I don't know -- I have wondered over these
7 14 years what possesses people to go down the road and to open
8 the doors of criminal conduct.  Is it the money -- the easy
9 money?  The thrill of getting away with something?  The peer
10 pressure?
11     I know that it is always very sad, and this case is
12 no exception.
13     I think, in the case of Medicare fraud, which is such
14 a serious, serious offense at this time in our country, where
15 healthcare of all persons, but especially the elderly and
16 disabled, are of such concern to our society as a whole, this
17 culture of which this Defendant became a member, this culture
18 has grown and developed in Miami of persons who think they
19 deserve to steal money from the Government that is meant to
20 give healthcare for the elderly and disabled, persons not
21 unlike your own mother.
22     And there are so many levels.  This has become such a
23 huge criminal industry in Miami.  Yes.  There are the people
24 involved in the clinics.  There are the people involved in the
25 billing.  There are the people like this Defendant involved in

74

1  the money laundering to hide the assets and distribute the
2  assets. It is one big free-for-all.
3       And not one person, not Scarlet Duarte, not Miguel
4  Libera, not Rechart Garcia, not Diana Sotto -- not one person
5  says, "Wait a minute. What am I doing here? Is this money
6  worth it? Do I want to take a chance to spend time in jail?
7  Should I be stealing from the Federal Government monies that
8  are meant to help people with their health?"
9       Can there be anything that is really much worse than
10 taking money from people who need it for their health, from the
11 disabled to buy a car, to buy a school uniform, to be part of
12 the gang? And if for no other reason than to not wound your
13 own family and your own children.
14      The Defendant has asked me -- at one point, he asked
15 for the lowest end of the guidelines -- defense counsel -- And
16 he has asked for a downward variance. And I don't find that a
17 downward variance is appropriate in this case either.
18      The Eleventh Circuit in _United States versus Pugh_ set
19 forth a procedure for a sentencing court to follow -- and _Pugh_
20 is reported at 515 F.3d 1179, a 2008 decision -- a procedure
21 for a sentencing court to follow when there is a request for a
22 downward variance.
23      And the _Pugh_ court, first of all, found, as does this
24 Court, that pursuant to _Kimborough_ and _Booker_ and _Gall_ and
25 other Supreme Court case law, that the sentencing guidelines

75

1  are advisory. The Court is not bound by them. The Court must
2  consult them, take them into account, but they are advisory.
3       The procedure the Court must follow is to first
4  correctly calculate the guidelines and then give both parties
5  an opportunity to argue for whatever sentence they deem
6  appropriate and then the Court should consider the 3553(a)
7  factors to determine whether they support the requested
8  sentence.
9       Under 3553(a), the Court is to consider the nature
10 and circumstances of the offense and the history and
11 characteristics of the Defendant as well. As I've indicated,
12 the nature and circumstances of the offense is a very
13 serious -- these are very serious offenses.
14      The money laundering, conspiracy and substantive
15 offenses concerning monies stolen from Medicare have such a
16 huge impact in our country today, not only as they directly
17 affect so many people who are struggling for healthcare, but
18 our community and our society as a whole that is struggling
19 with, "How do we provide healthcare? What are the
20 responsibilities of Government?"
21      And here, we have a program that a large number of
22 people have decided is money that's there for the taking for
23 them, for their own personal purposes.
24      The history and characteristics of the Defendant:
25 The Defendant has no prior criminal history.

76

1       The Court also has to consider the need for the
2  sentence imposed to reflect the seriousness of the offense, to
3  promote respect for the law and provide just punishment, to
4  afford adequate deterrence to criminal conduct, to protect the
5  public from further crimes of the Defendant, the need to avoid
6  unwarranted sentencing disparities among Defendants with
7  similar records who have been found guilty of similar conduct
8  and the advisory guidelines.
9       When I consider the need for the sentence in this
10 case to reflect the seriousness of the offense, to promote
11 respect for the law and to afford adequate deterrence to
12 criminal conduct, it is not just adequate deterrence to
13 criminal conduct of this Defendant, but adequate deterrence to
14 criminal conduct for those other members of our community who
15 feel that being involved in healthcare fraud and the laundering
16 of monies of healthcare fraud is something that they should
17 participate in.
18      I find that, in order to effect both just punishment
19 and the need for the sentence in this case to reflect the
20 seriousness of the offense, that a sentence of 97 months, which
21 is the highest end of the advisory guidelines, is just. It is
22 warranted by the conduct of the Defendant and her involvement
23 in this case.
24      I hope it will serve as adequate deterrence by this
25 Defendant and others that Medicare fraud -- if convicted of

77

1  Medicare fraud, persons who stand before this Court will be
2  dealt with very seriously. It is a long time. It is eight
3  years and one month in prison, eight years where this Defendant
4  will not be there for her children.
5       The Court has considered the statements of the
6  parties, the revised advisory presentence investigation report,
7  which contains the advisory guidelines and the statutory
8  factors set forth in Title 18, United States Code,
9  Section 3553(a)(1) through (7).
10      It is the finding of the Court that the Defendant is
11 not able to pay a fine and, therefore, no fine shall be
12 imposed.
13      Pursuant to the Sentencing Reform Act of 1984, it is
14 the judgment of the Court that the Defendant, Scarlet Duarte,
15 is hereby committed to the custody of the United States Bureau
16 of Prisons to be imprisoned for 97 months.
17      This term consists of 97 months as to each of
18 Counts 17, 18 through 20, 26 and 27, to be served concurrently.
19      Upon release from imprisonment, the Defendant shall
20 be placed on supervised release for a term of three years.
21 This term consists of three years as to all counts, all such
22 terms to run concurrently.
23      Within 48 hours of release from the custody of the
24 United States Bureau of Prisons, the Defendant shall report in
25 person to the probation office in the district to which she is

78

1 released.

2 While on supervised release, the Defendant shall not

3 commit any federal, state or local crimes; she shall be

4 prohibited from possessing a firearm or other dangerous device;

5 she shall not possess a controlled substance; she shall

6 cooperate in the collection of DNA and shall comply with the

7 standard conditions of supervised release that have been

8 adopted by this Court and with the following special

9 conditions:

10 The Defendant shall obtain prior written approval

11 from the Court before entering into any self-employment.

12 The Defendant shall submit to a search of her person

13 or property conducted in a reasonable manner and at a

14 reasonable time by the United States probation officer.

15 One moment, please.

16 The Defendant shall maintain full-time legitimate

17 employment and not be unemployed for a term of more than

18 30 days unless excused by the United States probation officer.

19 The Defendant shall provide documentation, including,

20 but not limited to, pay stubs, contractual agreements, W-2 wage

21 and earning statements and other documents requested by the

22 United States probation officer.

23 The Defendant shall not be engaged in any business

24 that has any contact, whether directly or indirectly, with the

25 medical field or insurance, whether it be private insurance or

79

1 governmental insurance, including Medicare or Medicaid.

2 It is further ordered that the Defendant shall pay a

3 special assessment of $100 as to each of Counts 17, 18 through

4 20, 26 and 27, for a total of $600, which shall be due

5 immediately.

6 I also find that this sentence at the highest end of

7 the advisory guideline range avoids unwarranted sentencing

8 disparities for defendants with similar records and similar

9 conduct. (3)

10 Ms. Duarte, it is my duty to inform you that you have

11 ten days with which to appeal the judgment and sentence of this

12 Court.

13 Should you desire to appeal and be without funds with

14 which to prosecute an appeal, an attorney will be appointed to

15 represent you in connection with that appeal.

16 Should you fail to appeal within that ten-day period,

17 it will constitute a waiver of your right to appeal.

18 It is also my duty to elicit from counsel from both

19 sides fully articulated objections to the Court's finding of

20 facts and conclusions of law as announced at this sentencing

21 hearing and to further elicit any objections which either side

22 may have to the manner in which sentence was imposed in this

23 case.

24 Are there any objections from the Government?

25 MR. OSBORNE: No, your Honor.

80

1 THE COURT: From the Defendant?

2 MR. RODRIGUEZ-VARELA: No, Judge.

3 THE COURT: The marshal will execute the sentence of

4 the Court.

5 MR. RODRIGUEZ-VARELA: Judge, may I address one other

6 issue?

7 THE COURT: Yes.

8 MR. RODRIGUEZ-VARELA: I was allowed to enter this

9 case for purposes of sentencing, and I filed my notice of

10 appearance for purposes of sentencing.

11 Now the Defendant may need to file a notice of appeal

12 and may need to prosecute her appeal.

13 I think that the Court will need to inquire of her, I

14 guess, or someone will need to inquire of her regarding funds

15 to hire a lawyer or impose perhaps CJA counsel for purposes of

16 appeal.

17 I can always file the notice for her so we

18 don't waive anything.

19 THE COURT: I think you're responsible for filing the

20 notice of appeal.

21 MR. RODRIGUEZ-VARELA: I will do that. I will do

22 that.

23 THE COURT: I had found her to be indigent for costs.

24 Correct?

25 MR. RODRIGUEZ-VARELA: Yes. I think -- yes, you had.

81

1 THE COURT: And she had prior CJA counsel.

2 MR. RODRIGUEZ-VARELA: She did.

3 Norris was CJA?

4 THE DEFENDANT: Yes.

5 MR. RODRIGUEZ-VARELA: Yes.

6 THE COURT: Do you have money, ma'am, for -- let's

7 place her under oath, please.

8 (Whereupon, the Defendant was duly sworn.)

9 THE COURT: Do you have money to hire an attorney for

10 an appeal -- to prosecute an appeal for you, ma'am?

11 THE DEFENDANT: I don't.

12 THE COURT: Do you have any money in the bank, own

13 any property or a car?

14 THE DEFENDANT: The cars are financed, and I don't

15 own a property.

16 THE COURT: I'll appoint counsel to prosecute an

17 appeal for her.

18 Mr. Rodriguez, you're appointed.

19 MR. RODRIGUEZ-VARELA: I'm not on the CJA panel.

20 THE COURT: You're not on the CJA panel?

21 MR. RODRIGUEZ-VARELA: I'll accept your appointment,

22 but I'm not on the CJA panel.

23 THE COURT: You're not on the CJA panel?

24 MR. RODRIGUEZ-VARELA: No, your Honor. I never have

25 been.

82

1           THE COURT:  I didn't realize that.

2           So, then, I will pick appellate counsel from the CJA

3   panel.

4           MR. RODRIGUEZ-VARELA:  Thank you.

5           THE COURT:  You are responsible for filing the notice

6   of appeal.

7           MR. RODRIGUEZ-VARELA:  I will do so, your Honor.

8   Thank you.

9           THE COURT:  The marshal will execute the sentence of

10  the Court.

11          We're in recess.  Thank you.

12          (Proceeding concluded.)

13

14                  C E R T I F I C A T E

15

16          I hereby certify that the foregoing is an accurate

17  transcription of the proceedings in the above-entitled matter.

18

19

20  _____          /s/Lisa Edwards
        DATE            LISA EDWARDS, CRR, RMR
21                      Official United States Court Reporter
                        400 North Miami Avenue, Twelfth Floor
22                      Miami, Florida 33128
                        (305) 523-5499
23

24

25

EXHIBIT "D"

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   07/21/2006

SCARLET DUARTE, born on ▇▇▇▇▇▇▇ 1972, Social Security Account number ▇▇▇▇▇▇▇, was interviewed at the office of the United States' Attorney, Miami, Florida. Also present for the interview, was DUARTE's attorney, ALLAN B. KAISER and Assistant United States' Attorney (AUSA) Marc Osborne. Already familiar with the identities of the interviewers and the nature of the interview, DUARTE provided the following information:

DUARTE was interviewed under the protection of a "use immunity" letter which was explained to her by her attorney prior to the start of the interview. Both DUARTE and KAISER signed this letter.

DUARTE informed interviewers that she would not be available for any Federal Grand Jury (FGJ) testimony in the upcoming week, because she was scheduled to leave on a cruise with ROYAL CARIBBEAN CRUISE LINES.

DUARTE has known DIANA SOTTO, whose identity is known to Agents, since they were in 8th grade. DUARTE and SOTTO lost touch after school, but became reacquainted, through a mutual friend, DINA Last Name Unknown (LNU), near the end of 2003. At that time, DUARTE was working in the accounting field and SOTTO was already running her medical billing business, ALL MEDICAL BILLING SOLUTIONS, INC (ALL MEDICAL). SOTTO was concurrently running a landscaping business with her husband in the Florida Keys.

From December 2005 to February 2006, DUARTE worked for SOTTO at ALL MEDICAL. DUARTE mainly did filing and other clerical work for SOTTO. ALL MEDICAL had a lot of clients when DUARTE was an employee.

At some point during DUARTE's employment, SOTTO became aware that DUARTE was having financial difficulties. SOTTO told DUARTE that if DUARTE opened corporations for SOTTO in DUARTE's name, SOTTO would pay DUARTE. One of these businesses was 24 HOUR NETWORK SOLUTIONS (24 HOUR). SOTTO had planned to make deposits into 24 HOUR from one of ALL MEDICAL's clients, PROJECT NEW HOPE, INC (PNH), which was a clinic that treated patients infected with Acquired Immunodeficiency Syndrome (AIDS). DUARTE was then expected to withdraw the money and return it to SOTTO. For her

| | | |
|---|---|---|
| Investigation on | 07/07/2006 | at Miami, Florida |
| File # 209A-MM-106819 | | |
| SA Avatar LeFevre:al | | Date dictated |
| by SA Huy Nguyen | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

2056

FD-302a (Rev. 10-6-95)

209A-MM-106819

Continuation of FD-302 of ___SCARLET DUARTE_____ , On _07/07/2006_ , Page __2__

participation, DUARTE was to be paid a percentage of the total withdrawal. All of the checks that were paid payable to 24 HOUR from PNH were given to DUARTE from SOTTO.

DUARTE then informed Agents that prior to 24 HOUR, DUARTE had a similar arrangement with SOTTO. In October 2004, SOTTO told DUARTE to have DUARTE's step-father, FRANCISCO FALCON open a corporation for the same purpose as 24 HOUR. DUARTE did this in order to help FRANCISCO, who was also having financial problems. DUARTE opened the company, FALCON TRANSPORT (FALCON), with her step-father as the registered owner. DUARTE told FRANCISCO that the arrangement was a good opportunity, but did not tell him anything else. DUARTE handled all of the checks for FALCON, including deposits and withdrawals. DUARTE recalled that the first check she received for FALCON may have been from LUIS MANUEL FERNANDEZ, the owner of PNH. The other checks, however, were provided to her by SOTTO.

For 24 HOUR, DUARTE followed a set pattern. SOTTO gave DUARTE checks for varying amounts. DUARTE then deposited the checks into the corresponding bank account. DUARTE then withdrew cash in small amounts, as she was instructed by SOTTO. Finally, DUARTE provided the cash to SOTTO. Somewhere during this process, DUARTE was provided her percentage. DUARTE informed Agents that she also deposited her own personal checks into the bank account of 24 HOUR.

DUARTE followed the same method for FALCON with one exception. DUARTE did not withdraw the money herself from FALCON. DUARTE wrote checks to cash and gave the checks to friends of hers. These friends cashed said checks, received a small percentage, in payment for their service, and gave the rest to DUARTE. DUARTE then gave the money to SOTTO. DUARTE insisted that this modification was purely for convenience as there were no bank branches near her residence.

Between June and December 2005, DUARTE ran another billing company, owned by SOTTO. This billing company, MD BILLING AND CONSULTING (MD BILLING). MD BILLING received money from ALL MEDICAL. DUARTE paid herself in cash from MD BILLING's bank account. MD BILLING closed in December 2005, because expenses were too high. Some of the clients at MD BILLING were from ALL MEDICAL and at least one (1) was an AIDS clinic. In the end, MD BILLING "didn't work out".

2057

FD-302a (Rev. 10-6-95)

209A-MM-106819

Continuation of FD-302 of ___SCARLET DUARTE_____ , On _07/07/2006_ , Page ___3___

DUARTE knew FERNANDEZ prior to any of the above-mentioned business dealings. FERNANDEZ's family is friends with SOTTO's family, and DUARTE met FERNANDEZ's family, to include his wife, MARIA JULIA, and daughter, BETTY, at a party.

DUARTE received approximately two (2%) percent of the money SOTTO gave to her. DUARTE eventually closed FALCON's bank account, because there was no money left in the account and the service charges were too high. For his involvement, DUARTE paid FRANCISCO a total of $5000.

DUARTE informed Agents that she has never been to PNH.

SOTTO devised the name for 24 HOUR. DUARTE admitted that 24 HOUR never provided any services to PNH or FERNANDEZ.

DUARTE thought that PNH was a legitimate clinic. DUARTE also thought that the money she gave back to SOTTO from cashed checks went to FERNANDEZ. DUARTE thought FERNANDEZ and SOTTO were just trying to avoid taxes by using DUARTE and her corporations. DUARTE admitted that FALCON never provided any services to PNH or FERNANDEZ.

MARIA PEREZ, who is an employee of ALL MEDICAL and a very good friend of SOTTO did not know of the businesses that DUARTE ran.

At ALL MEDICAL, doctors and clinics fax daily billing records. Any clerical errors require re-transmittal from by the doctor or clinic.

A long time ago, DUARTE and SOTTO opened another business in DUARTE's name, S&D MEDICAL. S&D MEDICAL never received any money and was closed.

In addition to ALL MEDICAL, SOTTO does independent consulting for clinics and doctors. SOTTO handles Medicare and Medicaid applications.

At this juncture in the interview, DUARTE was shown the following Florida Driver's and Vehicle Information Database (DAVID) photographs:

1. ███████████:            No recollection

2058

FD-302a (Rev. 10-6-95)

209A-MM-106819

Continuation of FD-302 of ___SCARLET DUARTE___ , On 07/07/2006 , Page 4

2. ▮▮▮▮▮▮▮:                       Identified as GABBY's grandmother
3. LUIS MANUEL FERNANDEZ:         Identified as owner of PNH
4. MARIA JULIA LORIGA:            Identified as LUIS MANUEL's wife/ sometimes in PNH
5. BEATRIZ FERNANDEZ:             Identified as daughter of LUIS MANUEL
6. ▮▮▮▮▮▮▮:                       No recollection
7. SANDRA GALVEZ:                 Identified as nurse at PNH/ seen at family pool party

DUARTE stated that SOTTO never told DUARTE not to talk to the FBI or law enforcement.  SOTTO told DUARTE that employees of PNH had been arrested a couple of days after the arrests. Following an FBI search warrant of ALL MEDICAL, SOTTO again informed DUARTE.

DUARTE again insisted that SOTTO never gave DUARTE any instructions to follow, regarding the investigation.

SOTTO never asked or told DUARTE to lie for SOTTO.

DUARTE told SOTTO that DUARTE was going to cooperate with the government, to which SOTTO replied, "Okay, you need to do what you need to do."

DUARTE did not know that cashing checks for others, as she had, was illegal.

Another employee at ALL MEDICAL, LORI SANCHEZ, also opened a corporation and cashed checks for SOTTO.  DUARTE learned of this when SOTTO told her that "LORI may have a problem too." LORI's company was also a transport company registered to her husband, JON.  FBI Agents visited the SANCHEZ's and LORI subsequently resigned from ALL MEDICAL.

▮▮▮▮▮▮▮ DUARTE was shown DAVID photographs of ▮▮▮▮▮▮▮ , and ▮▮▮▮▮▮▮ .  DUARTE was unable to recognize any of the above three (3) individuals.

Original interview notes were included in a 1A envelope and added to the case file.

EXHIBIT "E"

# BNA Insights

RIGHT TO COUNSEL

## Supreme Court's Rulings on Ineffective Assistance at Plea Bargaining Stage Call for New Efforts by Not Only Defense Counsel but Also Prosecutors and Judges



By Laurie L. Levenson

It is a big year for U.S. Supreme Court cases. Health care, affirmative action, GPS devices, strip searches—the court selected many of the hot-button issues to decide this term. Among the most important cases are *Missouri v. Frye*, 2012 BL 67235 (U.S. 3/21/2012), and *Lafler v. Cooper*, BL 67236 (U.S. 3/21/2012). In these opinions, the court recognized that plea bargaining lies at the heart of the way that the current criminal justice system operates. Thus, the court's decision to set standards for defense counsel's assistance during plea bargaining has the potential to dramatically affect how plea bargaining is handled in this country.

Plea bargains are the lifeblood of the American criminal justice system. Current studies suggest that up to 95 percent of all cases are resolved by plea bargaining. Yet, courts rarely monitor what occurs during the plea-bargaining process. Practices vary tremendously. From extensive negotiations with formal, written plea-agreement contracts to a process most resembling horse-trading in arraignment courts, defendants' fates are resolved by lawyers deciding, with only minimal input by the client, how cases should be resolved. With the focus on efficiently and expeditiously resolving

*Laurie L. Levenson is professor of law and holds the David W. Burcham Chair in Ethical Advocacy at Loyola Law School, Los Angeles.*

cases, defendants—especially those least educated and sophisticated—often get left in a fog.

In his opinions in *Frye* and *Cooper*, Justice Anthony M. Kennedy tried to change that dynamic by holding that the minimum standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), also apply to plea bargaining by counsel. Yet, as even Kennedy had to admit, a standard established to judge counsel's performance at trial or in preparing for trial is less than a perfect fit for the plea-bargaining process.

First, it is important to look at exactly what the court decided in this pair of 5-4 opinions. Then one must consider the likely practical impact on defense lawyers, prosecutors, and judges.

### Missouri v. Frye: 'Thou Shalt Communicate With Your Client!'

In *Frye*, Galin Frye was charged with driving with a revoked license. Because this was his fourth violation, he was charged under Missouri law with a felony that carried a maximum four-year prison term. The prosecutor sent Frye's lawyer a letter offering to reduce the charge to a misdemeanor and to recommend a 90-day sentence if Frye would plead guilty. Frye's lawyer never conveyed the offer to Frye, and the offer expired. Right before Frye's preliminary hearing, he was arrested again for the same offense. Frye ended up pleading guilty with no underlying plea agreement and was sentenced to three years in prison.

On habeas corpus review, Frye claimed his Sixth Amendment right to effective assistance of counsel was violated because his counsel failed to inform him of the prosecution's plea offer and he would have accepted the offer if he had known about it. The first hurdle Frye had to overcome in making his claim was to convince the court that he had a right to effective assistance of counsel at the plea-bargaining stage, given that the Supreme Court has never recognized a constitutional right to plea bargaining. Yet the majority in *Frye* had little trouble recognizing plea bargaining as a "critical stage" at which the Sixth Amendment guaranteed the defendant the right to counsel.

Extrapolating from the court's opinion in *Hill v. Lockhart*, 474 U.S. 52 (1985) and its more recent decision in *Padilla v. Kentucky*, 2010 BL 70791 (U.S. 2010), Kennedy held that the Sixth Amendment guaranteed Frye the right to effective assistance of counsel during

plea bargaining. Neither *Hill* nor *Padilla* was directly on point because they focused more on whether counsel's misadvice negated their clients' guilty pleas. In *Hill*, defense counsel misinformed the defendant of the amount of time he would have to serve before he became eligible for parole. In *Padilla*, the court set aside a plea because defense counsel misinformed the defendant of the immigration consequences of the conviction. Yet the language from these cases became critical to the task of finding a general duty of effective assistance of counsel in plea bargaining. In particular, Kennedy focused on the court's statement in *Padilla* that "the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel."

Although Kennedy recognized that there is a difference between invalidating a plea because bad advice was given regarding the guilty plea and the situation in *Frye*, where the challenge was to defense counsel's conduct during plea bargaining before the plea proceedings, he found that the differences were not constitutionally significant. More important, he was convinced that the "simple reality" of our criminal justice system made it imperative for the court to include counsel's conduct during plea bargaining within the Sixth Amendment's umbrella. As Kennedy noted, 97 percent of federal convictions and 94 percent of state convictions are the result of guilty pleas. "The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages," he stated.

Yet, recognizing the right to effective assistance of counsel during plea bargaining was just step No. 1 in the court's analysis. The more challenging task was defining what standards should be used in measuring whether counsel has met Sixth Amendment requirements. Pursuant to the ineffective assistance of counsel standard set forth in *Strickland*, a defendant must demonstrate that counsel's representation fell below professional standards. While it may not be possible to identify exact standards for how counsel should act during plea bargaining, the minimum requirements are not that difficult to identify.

The most basic requirement is that a lawyer must actually communicate the terms of a formal plea offer to the client. Especially when there is an offer with an expiration date, defense counsel must let the client consider the offer before it expires. This is not a new concept. The American Bar Association Standards for Criminal Justice and many states' professional standards require counsel to promptly communicate and explain plea offers to a client. See ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2(a) (3d ed. 1999).

Step No. 2 of the *Strickland* analysis, as applied to plea bargaining, is a little more challenging. How does a defendant show that counsel's ineffective assistance during plea bargaining prejudiced his or her case? Here, the court held that to establish prejudice, Frye would have to show "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." If it is an offer, like that in *Frye*, that could be withdrawn by the prosecution or

rejected by the court, the defendant must show that the offer would have remained and that he would have received the benefit of the plea bargain.

Despite the many "ifs" in the court's standard, the majority felt confident that on remand these issues could be resolved. In fact, the court suggested that Frye might not be able to meet the standard given that he picked up a new charge for driving without a license shortly before his plea, which quite likely might have led the prosecution to withdraw its offer or have prompted the trial court to reject it. Nonetheless, Frye should have an opportunity to demonstrate whether his case was prejudiced.

Justice Antonin Scalia wrote for the four dissenters, who objected to the majority's decision on the most basic level. As the dissent states, "The plea-bargaining process is a subject worthy of regulation, since it is the means by which most criminal convictions are obtained. It happens not to be, however, a subject covered by the Sixth Amendment, which is concerned not with the fairness of plea bargaining but with the fairness of conviction." Frye never argued that he was not guilty of the offense to which he pleaded guilty. His conviction was fair, even though he might have hoped for a more favorable resolution of the case.

## Lafler v. Cooper: 'Thou Shalt Give Your Client Accurate Information in Deciding Whether to Accept a Plea Bargain'

In the companion case of *Lafler v. Cooper*, Kennedy again wrote for the majority. While this case involved plea bargaining, the misstep by defense counsel was different.

Anthony Cooper was charged with assault with intent to murder, possession of a firearm by a felon, possession of a firearm in commission of a felony, misdemeanor possession of marijuana, and for being a habitual offender. Evidently Cooper, a convicted felon, pointed a gun and shot at his victim's head. The shot missed and the victim ran. Cooper shot again and hit her in the buttocks, hip, and abdomen. She survived the shots.

Prosecutors twice offered to dismiss two of the charges and recommend a sentence of 51 to 85 months for the other charges. Defendant admitted his guilt in communications with the court and expressed a willingness to accept the offer. However, he changed his mind when his lawyer convinced him that the prosecution would be unable to establish intent to murder the victim because she had been shot below the waist. Cooper ended up going to trial, rejecting yet another plea offer on the first day of trial. He was convicted by a jury and received a mandatory minimum sentence of 185 to 360 months' imprisonment, more than three times what he would had received if he had accepted the prosecution's initial plea offer.

Using the analytic structure established in *Frye* and *Strickland*, the Supreme Court held that counsel's advice constituted ineffective assistance of counsel. First, the parties conceded that counsel's performance was deficient. No competent counsel would have believed that Cooper could not be found to have the intent to murder simply because his shots had hit the victim below the waist. Second, the court held that, but for counsel's deficient performance, there was a reasonable

COPYRIGHT © 2012 BY THE BUREAU OF NATIONAL AFFAIRS, INC.     CRL     ISSN 0011-1341

probability that he and the trial court would have accepted the guilty plea. His letters to the court and testimony at a post-conviction hearing established that fact.

The real issue was what the remedy should be. How could Cooper be made whole at this point? The Supreme Court held that the proper remedy was to order the state to reoffer the plea bargain.

While raising issues similar to those in *Frye*, Cooper added another dimension to the court's decision to recognize a right to effective assistance of counsel during plea bargaining. Cooper's case was not like that of *Hill*, in which the court had held that improper advice by counsel could invalidate a guilty plea. Cooper went to trial. He did not argue that he received an unfair trial. Rather, he relied on a yet-to-be-recognized right to accept a plea bargain.

In the end, the court found the distinction to be without a difference. The defendant's fair trial did not wipe clean his lawyer's deficiencies. With plea bargaining such a critical aspect of the criminal justice system, saying that a fair trial makes up for any deficiencies in counsel's conduct during the pretrial process ignores the reality of the substantial effect plea bargaining can have on a defendant's future.

The dissent was even more vociferous in *Cooper* than it had been in *Frye*. Writing for the dissenters, Scalia lamented the creation of a "whole new field of constitutionalized criminal procedure: plea-bargaining law." He warned that there are many more dimensions of plea bargaining that will have to be addressed and that, although the two cases this term focused on defense counsel's behavior, the next ones down the road may inevitably try to establish "constitutional" rules regarding prosecutors' behavior in the criminal justice system.

For the dissenters, a defendant's constitutional rights are about whether the defendant received a full and fair trial. Since Cooper received such a trial, he had no constitutional right to a plea bargain. Moreover, the court's remedy that the prosecution reoffer its original plea offer constituted undue interference with the criminal justice process, they said. Plea bargaining may be in great use in the United States, but it is at best "a necessary evil" and "embarrassing adjunct" to our criminal justice system, according to Scalia. By recognizing the right to effective assistance of counsel at plea bargaining, the court had shifted to making plea bargaining "the criminal justice system."

In language that is the trademark of Scalia, he wrote:

> The Court today embraces the sporting-chance theory of criminal law, in which the State functions like a conscientious casino-operator, giving each player a fair chance to beat the house, that is, to serve less time than the law says he deserves. And when a player is excluded from the tables, his *constitutional rights* have been violated. I do not subscribe to that theory. No one should, least of all the Justices of the Supreme Court.

The other dissenters did not join in this part of his opinion, but his point was clear. The Constitution guarantees the right to a fair trial, and nothing that happens in the plea-bargaining process undermines that right.

In his separate, solo dissent, Justice Samuel A. Alito Jr. focused on an evident weakness in the majority's decision. The majority left implementation of the remedy to the trial court. Is it fair if the prosecution goes to trial to require it to vacate some of the convictions?

Alito wondered. How will courts decide what to do when, years after a conviction, there is an allegation that the defendant received ineffective assistance of counsel during the plea-bargaining process? It is well and good for the court to say that it leaves the issue to the "discretion of the trial court," but there is very little guidance about how judges should exercise that discretion, he said.

## Aftermath of Frye and Cooper: What Do We Do Now?

How are *Frye* and *Cooper* likely to change the actions of defense counsel, prosecutors, and the courts? The court's decisions in these cases are likely to have a significant practical impact on plea bargaining practices across the nation.

**Defense Counsel's Responsibilities.** First, defense lawyers must do what they should have been doing all along. They need to talk to their clients and give them accurate advice. This may sound easy, but in the quick-moving, rough-and-tumble world of plea bargaining, it is not always easy for counsel to have in-depth discussions about all the prosecution's offers. Often, their clients cannot be reached by simply picking up the phone. Defense lawyers must go through elaborate processes to visit clients in jail and, even then, the conditions are less than optimal for having full conferences regarding plea offers.

Second, defense counsel must keep clear records of not only the offers prosecutors present but also their expiration dates, how likely they are to be withdrawn, how and when the offers were presented to the client, and what changes are made in the offers. Of course, many lawyers already do this, but the Supreme Court's decisions will make the lawyer's recordkeeping key evidence in any post-plea or post-trial hearings.

Third, defense counsel should probably give every indication to the prosecution that a defendant is likely to accept an offer, even if counsel is unsure, so that the record remains strong for subsequent proceedings. Therefore, it might be more difficult for defense counsel to be as candid with prosecutors as to the likelihood of a defendant accepting a plea offer because telling a prosecutor straight out that a client does not seem so inclined may later hurt the defendant's chances at post-conviction relief.

Finally, defense counsel must consider every plea bargain to be as important as a trial. This is not necessarily a bad thing. Certainly a defendant pleading guilty would expect such a commitment by defense counsel. Yet, for defense lawyers, pleas have long taken a back seat to trial preparation. Given the court's decisions, this can no longer be the case.

**Prosecutors' Responsibilities.** Prosecutors will also find themselves with newfound responsibilities after *Frye* and *Cooper*. To ensure that a defendant will not be able to win reversal of his conviction years down the line, prosecutors should document all plea offers, their expiration dates, the conditions under which they will be withdrawn, and whether they are binding on the court. Then, the prudent prosecutor may ask for written confirmation that the offer has been shared with the client. Undoubtedly prosecutors' offices will start developing signed notice forms that can be used to document plea offers.

Prosecutors should also ask the court to put on the record before a trial whether there were any plea offers and that the defendant rejected the offer. The complication with this is that judges, at least in the federal system, should not be involved in plea bargaining. One must be concerned how even this effort might subtly involve the judge in plea discussions. Thus, it may be necessary to have the defendant verify that a plea offer was made but have the written terms of that plea offer lodged with the court under seal.

Finally, prosecutors might find themselves in the awkward position of having the court inquire whether defense counsel has not only shared a plea offer but has adequately answered the defendant's questions regarding the process and applicable law that would affect his decision whether to accept the offer.

The plea-bargaining process, which is intended to make the criminal justice process more expeditious, may need to be slowed down to accommodate the new procedures that will ensure effective assistance of counsel during plea bargaining.

**Judges' Responsibilities.** Ultimately, the responsibility will fall on judges to ensure that defense counsel adequately participates in the plea-bargaining process. This is true regardless of whether the case ends in a guilty plea or with a trial. A prudent judge will now ask the parties and counsel whether there were any plea offers and whether their terms were communicated to the defendant. Moreover, the judge may also ask counsel to put on the record, in camera or in open court, why a defendant is declining a plea offer.

The judge must take these steps without interfering with the attorney-client relationship. Defense counsel may be privy to additional information demonstrating why a defendant should not accept the deal, but the judge is not necessarily entitled to have all this information. Judges must also resist the temptation to second-guess defense counsel's strategy in counseling a client to reject a plea offer. As in *Strickland*, great deference should be afforded to the decisions of defense counsel. While the court may view a plea offer as too good to refuse, defense counsel may have strategic reasons to suggest that the defendant reject a specific plea offer.

Finally, the court must maintain its role as an impartial decision maker and resist any temptation to be drawn into the actual plea negotiations. Pursuant to Fed. R. Crim. P. 11(c) (1), "The court must not participate in [plea agreement] discussions." To preserve the court's impartiality and avoid putting undue pressure on a defendant to accept a plea deal, the rules specifically prohibit judges from participating in plea bargaining. See *United States v. Bradley*, 455 F.3d 453 (4th Cir. 2006). Courts must now walk the line between documentation of plea offers and unnecessary and unwarranted intrusion into the plea bargaining process.

## Conclusion

The lessons of *Frye* and *Cooper* seem simple on their face: Defense counsel must convey all plea offers to a client and then provide adequate advice as to whether to accept such offers.

However, as the Supreme Court recognized in these recent decisions, this simple rule will not always be easily enforced. Plea bargaining is more of an art than a science; there is no "one way" to cut the perfect deal.

Like it or not, the plea-bargaining process will continue. Defense lawyers have a Sixth Amendment duty to professionally advise their clients with respect to such negotiations. However, everyone in the criminal justice system, including the judge, must now keep track of what pleas are being made and whether the defendant has been adequately counseled about the advisability of the plea deal. The plea-bargaining process may be distasteful and a nuisance, but it is also a reality. Today's "justice" comes with plenty of strings attached.

COPYRIGHT © 2012 BY THE BUREAU OF NATIONAL AFFAIRS, INC.    CRL    ISSN 0011-1341

EXHIBIT "F"

Miami, Florida
December 8th, 2009


Honorable Judge Joan A. Lenard
301 North Miami Ave Room 150
Miami, Florida 33128

Docket#: 113C 1:08CR20851

Honorable Judge:

    I hope my letter finds you well. I am sending this letter to you in such short notice because the circumstances have forced me to act this way, please consider this letter as pro se motion, I wish to terminate the services of my court appointed attorney William M. Norris. I have placed my trust in Mr. Norris representation and the outcome has been a disaster, I am intending to remedy my situation by hiring another attorney, a private counsel that has shown me that he is committed to my defense. As this honorable court knows, a sentencing for a criminal matter, is a serious issue, I think that Mr. Norris had misled me in many ways, and this has created a serious conflict, he has not handled my representation with the professionalism that is expected from an attorney. My family has gathered their best efforts to hire the services of a private counsel, and I wish to ask for a continuance to allow my new consel to work on my case effectively, as this court is aware, I was remanded to the custody of   the United States Marshals, I am not getting any tactical advantage by requesting a continuance. It is a essencial for my defense to have an attorney that is really willing to represent me to the best of his ability and knowledge. The objections filed by Mr. Norris have been the product of my work, and even if i understand that the defendant's help is also needed, I consider that Mr. Norris has not been up to the standard of representation that was necessary for this case to have a better outcome. Attoneys have an ethical obligation, and I do not think that Mr. Norris has been in compliance with it.

    Thanks for the time invested in reading my letter. Sincerely,


Scarlet Duarte
Reg# 81409-004


"Be not overcome by evil, but overcome evil with good."


Romans 12:21

Scarlet Duarte 81409-004

FCC Coleman Camp Unit F4

P.O. Box 1027

Coleman, Fl 33521